UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL BRAZEAU,

               Petitioner,            **REPORT AND RECOMMENDATION**
                                         **No. 04-CV-0031(RJA)(VEB)**

    -vs-

ANTHONY F. ZON,

               Respondent.
_____

## I.    Introduction

On January 1, 2004, Michael Brazeau ("Brazeau" or "petitioner") filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Niagara County Court on charges of second degree assault and second degree robbery. Chief United States District Judge Richard J. Arcara has referred the matter to the undersigned for the issuance of a Report and Recommendation regarding the disposition of Brazeau's petition.

## II.    Factual Background and Procedural History

On the night of March 5, 2000, John Barrus ("Barrus" or "the victim"), was beaten and robbed in an alley as he was walking home from Rascal's Bar in the City of Niagara Falls. Barrus did not know his attacker by name, but he was able to describe him as the "big, bald, white guy" who had been playing in a pool league at Rascal's that night and who had been verbally harassing him. After further police investigation with other witnesses, Brazeau was brought in for questioning. He waived his rights and voluntarily gave a statement to police admitting to being present at the bar on the night in question but denying any involvement in the assault and robbery

of Barrus. A Niagara County Grand Jury returned an indictment charging Brazeau with second degree robbery and second degree assault. Brazeau's jury trial was held in Niagara County Court (Broderick, J.). Brazeau elected to represent himself with the assistance of standby counsel.

At trial, Barrus testified that he walked by himself to Rascals Bar to watch the pool leagues from Wagner's Bar and Rascal's play, arriving at about 8 o'clock p.m. T.322-23. Barrus testified that he knew the owners of the bar, and stated that he knew them as "Fred" and "Ann" but was not sure of their last name. T.323. He got a draft beer and sat down at a table near the pool tables. T.324-25. Barrus testified that a young woman whom he knew casually came in and sat down with him, and he bought her a drink. T.325.

Some time later, Barrus testified, he decided he "wanted to leave" because "a guy was making comments, stuff like that" about how Barrus was an "old man," "[j]ust to annoy [him]" T.325, 327-28. Barrus said that the man making the offensive comments was playing pool for one of the leagues. Barrus described him as "white," "[b]ald", and "good sized" meaning that he was "[q]uite a bit larger than [Barrus]." Barrus estimated the man's height as "over six feet" and his weight as "at least over 200 [pounds][.]" T.326.  Barrus thereafter identified Brazeau in court. T.326. Barrus testified that he had never seen Brazeau before that night. T.327. The comments made Barrus feel "uncomfortable" so he complained to Ann, one of the owners. However, Brazeau continued to pester him, so Barrus decided to leave. He asked Fred, the other owner, to escort him to the door "[b]ecause [he] didn't want any trouble." T.328. Once out the door, Barrus walked down Niagara Street toward the Wilson Farms convenience store. T.329. Barrus turned back around because he heard someone "calling" to him as if he knew him; he saw "a bald head and a torso that was sticking out" of the door to Rascal's Bar. T.333. It was "[d]efinitely . . . the

same person" who had been making comments to him at the bar. T.334. When Barrus saw who it was, he turned around and kept walking. T.334. He was walking through parking lot when he was joined by the "bald headed man that had came [sic] out of the bar, the same one that was shooting pool." T.335. Barrus testified, "All of a sudden it's like he's walking next to me." Barrus recalled that Brazeau was on his left-hand side and was "close" to him, "within a couple feet[.]" T.335. This time, however, Brazeau was "friendly" and said "[how] about coming to his house on 25th [Street], have a beer or something like that[.]" T.336. Barrus replied, "I don't want any beer, I'm going home." T.336. Barrus testified, "That was the last thing I remember." T.336.

The next thing Barrus could recall was "[c]oming to in the alley" behind Wilson Farms. According to Barrus, he "was laid right out in the alley" on the ground and he was "really . . . [d]isoriented, dazed." T.337.  His ankle was badly sprained and painful. Three of his teeth had been knocked loose and his face was in pain. T.338. He had a "hole right through [his] chin and lacerations up on both top and bottom of [his] mouth" as a result of injury to his teeth. T.338. Barrus testified that he knew that Brazeau hit him because he saw the hit coming from the side. T.339. Brazeau related that there were no other people around and no cars in the area. Nor were there any low-hanging branches or any obstacles on the ground in his way. T.336.

When Barrus came to, he was alone; Brazeau was gone. Barrus testified that when he left Rascal's Bar, he had three twenty-dollar bills in his wallet, along with four five-dollar bills, a ten-dollar bill, and some singles; all this money was gone after the incident. T.340. Barrus also had some money in his front pocket; that was gone, along with his keys. T.340. A passer-by gave him a ride home. T.341. Barrus, who did not have health insurance, did not go the hospital that night because he was "hurting too bad" to wait for medical treatment. T.342. The next morning, he

went back to the alley and found two pools of blood where he had been lying, his comb, and his Social Security card. T.342. He did not find his keys or his wallet. T.343.

At that point, Barrus did not know the name of his attacker. Barrus explained that he did not call the police because he "figured . . . with the guy playing pool . . . [and] being bald like that and everything else," he "wouldn't have a hard time finding a name" and then going to the police. T.342. When Ann and Fred came by his house the day after the incident, Ann "mentioned the name Mike[.]" T.344. Barrus called Wagner's Bar and spoke to someone who played in their pool league; he described the man who had mugged him and said that his name was "Mike." T.344. A person named Chuck Calhoun from Wagner's Bar called him a couple days later and "said Mike Brazeau, that's who [sic] is the guy's name." T.345. Barrus then went to the police station where he spoke with Detective Celestine Booze ("Detective Booze") and filled out an incident report. T.345. Detective Booze strongly recommended that Barrus go to the emergency room for medical treatment "especially after seeing . . . that when he drank water . . . it would come out of the holes in his chin[.]" T.483-84.

Detective Booze spoke with Barrus on March 9, 2000, when he filed his complaint. T.480-81. After speaking with him, she spoke with Fred and Ann Grace on same day. T.482-83. Barrus' description of his assailant was similar to the description of a man named "Mike" whom Ann Grace said had been in their bar. T.482. Detective Booze spoke to Brazeau on March 14, 2000, at the police station. Brazeau gave his address as 492 25th Street. T.487.  After he waived his rights under *Miranda*, Brazeau stated that he "never robbed or assaulted anybody." T.486-87. He admitted that he had been at Rascal's Bar shooting pool on the night of the incident as a substitute player for Wagner's Bar. T.487-88. When asked if he had gotten into a fight with his

girlfriend at the bar, Brazeau said that they had argued over a missed shot in the pool game. T.488. At that point, Detective Booze testified, Brazeau asked for a lawyer and the interview ended. T.488.

Joy Vail ("Vail"), managed Wagner's Bar part-time and played in their pool league, received a phone message from Rascal's Bar about an incident on March 5th inquiring as to "everybody's name on the pool team" from Wagner's. T.299-300. The physical description of the individual in question was "[a] big bald guy." T.300. Brazeau was the only "big bald guy" on the pool team playing for Wagner's that night. T.300. Moreover, Vail recalled, there was nobody else that looked like Brazeau at Rascal's that night. T.300. Vail also testified to a conversation with Brazeau, several days after the incident, in which she asked him about it; he assured her that he had talked to the police and had "straightened it out[.]" T.303-04. Vail admitted on cross-examination that she did not see Brazeau arguing with anybody at Rascal's on the night of the incident. T.306.

Charles "Chuck" Calhoun, from Wagner's Bar, testified that he had known Brazeau for about ten years and that they "played a lot of pool together" in pool leagues. T.312. He agreed that Brazeau was someone whom he would "consider a friend of [his] at some point[.]" T.312. Calhoun identified Brazeau in court. T.312. Calhoun learned from Vail that there had been an incident at the last pool tournament at Rascal's Bar; Vail also gave him a physical description of one of the persons who was supposed to have been involved. T.314-15. As a result of the conversation with Vail, Calhoun called the "person that he knew from Rascals that had been hurt" in the incident–that is, Barrus. T.314-15. Calhoun knew Barrus by his first-name only; they had played pool together for Rascal's Bar in the past. T.315-16. Calhoun testified that he gave

Brazeau's name to Barrus. T.316.

About a week after the incident, Calhoun encountered Brazeau at Wagner's Bar. T.316-17. Calhoun mentioned the incident, and Brazeau assured him that "it wasn't him that did it, that somebody was lying." T.317. Brazeau told him that the police had already talked to him and had "cleared it up." T.317-18.

Fred Grace ("Fred"), who owned Rascal's Bar with his wife, confirmed that he knew Barrus by sight from seeing him at the bar. T.260. On the night of the incident, Fred had walked Barrus to the door as he was leaving. T.257. Barrus said that he was leaving because he "didn't want to be bothered by anybody." T.257.  When Fred gave his statement to Detective Booze, he was only able to describe Barrus. However, when Detective Booze asked him if he knew Brazeau, he said, "[T]here was a man there, I heard the name, and he had had some words with his girlfriend, and that's why I remembered the name." T.260. Fred admitted that he did not see Brazeau "harass" the victim, but he did see Brazeau at Barrus' table at one time that night. T.261. In response to a question by Brazeau, Fred testified that he "did hear" Brazeau having an argument with his girlfriend. T.261.

Ann Grace ("Ann"), Fred's wife, testified that on the night of the incident, Barrus came into Rascal's. Ann recognized Barrus by sight and said that he came to Rascal's occasionally. T.272. Ann testified that Brazeau, whom she knew as "Mike," was playing pool for Wagner's Bar. T.273. Ann stated that she seen him on previous occasions and she identified him in court. T.273-74. Ann testified that there was not anybody else in the bar that looked like Brazeau that night. T.274.

At one point, Barrus came over to her and said, "Ann, please tell him to leave me alone,"

and indicated toward Brazeau. T.274. Ann approached Brazeau and said, "Mike [,]please leave him alone[.]" She walked away, and Barrus complained again that Brazeau was still bothering him. When asked what Brazeau's demeanor was when she approached him the second time, Ann said, "he was kind of mad I think . . . because I told him twice to leave John alone, and you know how they get . . . ["]I'm not touch [sic] him, I'm not doing nothing [sic].["] T.275.

Ann confirmed that her husband, Fred, walked John to the door. She looked out the window as Barrus was leaving and the "next thing [she] saw was this Michael walked out, made the same turn as John Barrus did, and that was it . . . and then [she] saw him come back" but did not come back inside Rascal's Bar. T.278.

Ann testified that she and Fred were contacted by Detective Booze several days later and learned of the incident involving Barrus. She and Fred both gave statements to Detective Booze physically describing Brazeau and Barrus. *E.g.*, T.282-83.  Ann also was able to supply Detective Booze with Brazeau's first name. T.283. When Ann and Fred went over to Barrus' house, he "was a mess." T.283. Ann testified that they did not tell Barrus that his assailant was Brazeau, however. T.284.

Brazeau testified in his own behalf at trial that he had been playing in the pool league for Wagner's team at Rascal's Bar on the night of the incident. Brazeau stated that he had gotten into an argument with his girlfriend over a missed pool shot. Brazeau claimed that he had never seen Barrus before but he recalled seeing Barrus sitting alone at a table that night. Brazeau denied speaking to Barrus at any time that night, however. After he left the bar, Brazeau testified, he went to Wilson Farms and then walked home. Brazeau denied encountering Barrus on the walk home and denied any involvement in the assault and robbery.

The jury returned a verdict convicting Brazeau as charged of robbery in the second degree and assault in the second degree. Brazeau was sentenced as a violent felony offender to a twelve-year determinate sentence on the robbery conviction and a seven-year determinate sentence on the assault conviction, those terms to be served concurrently. *See* S.52-53.[1]

Represented by new appellate counsel on direct appeal, Brazeau appealed to the New York State Supreme Court, Appellate Division, Fourth Department, challenging his conviction on the following grounds: (1) County Court erred in permitting the prosecutor to cross-examine him on his use of 26 aliases because he had not received notice of the People's intent to use such evidence to impeach him and the evidence had not been ruled admissible during a *Sandoval* conference; (2) he was entitled to notice of the alias evidence pursuant to New York Criminal Procedure Law § 240.43; (3)  the trial court erred in permitting the victim to identify petitioner at trial; (4) the trial court erred in denying petitioner's request for alternative identification procedures; (5) he was denied a fair trial by a delay in disclosing alleged *Brady* material; (6)  he was denied a fair trial by prosecutorial misconduct; (7) the trial court's initial charge to the jury was erroneous; (8) the trial court abused its discretion in responding to the jury's request for a readback of testimony; (9) the trial court erroneously curtailed defendant's cross-examination of a prosecution witness. The Appellate Division unanimously affirmed the conviction on May 2, 2003. *People v. Brazeau*, 304 A.D.2d 254, 759 N.Y.S.2d 268 (App. Div. 4th Dept. 2003). Leave to appeal to the New York State Court of Appeals for leave to appeal was denied on July 18, 2003. *People v. Brazeau*, 100 N.Y.2d 579, 764 N.Y.S.2d 389 (N.Y. 2003).

On or about February 2001, Brazeau filed a petition pursuant to Article 78 of New York

---

[1]     Citations to "S.__" refer to the transcript of the sentencing hearing on March 14, 2001.

Civil Practice Law and Rules in New York State Supreme Court (Niagara County) seeking a writ

of prohibition showing that the indictment was insufficient to confer jurisdiction upon the trial

court and district attorney. *See* Petition ("Pet.") at 4, ¶15(a)-(d) (Dkt. #1). Brazeau also filed a

petition for a writ of habeas corpus under New York law on December 5, 2001, "again

challenging the courts [sic] jurisdiction." *See* Pet. at 5, ¶16(a)-(d) (Dkt. #1).

This habeas petition followed in which Brazeau raises the following grounds for relief:

(1) the indictment was insufficient as a matter of law (Ground One, Pet. ¶22-A); (2) the

prosecution knowingly suborned perjury in the grand jury from Detective Booze, the police

officer who investigated the incident (Ground Two, Pet. at 8); (3) the trial court erred in finding

that, based on the grand jury minutes, there was sufficient evidence to support the indictment

(Ground Three, Pet. at 9); (4) petitioner's arrest was without probable cause and violative of the

Fourth Amendment (Ground Four, Pet. at 10); (5) Detective Booze filed a "false and misleading

information/complaint" against petitioner (Ground Five, Pet. at 11); (6) the evidence to support

the convictions for second degree robbery and second degree assault was insufficient (Ground

Six, Pet. at 12); (7) the prosecutor committed misconduct (Ground Seven, Pet. at 13); (8) the trial

court abused its discretion in responding to the jury's request for a readback of testimony

(Ground Eight, Pet. at 14); (9) the prosecutor violated its discovery obligations pursuant to *Brady*

*v. Maryland*, 373 U.S. 83 (1963) (Ground Nine, Pet. at 16); (10) the trial court erred in denying

petitioner's motion to preclude the victim from identifying  him in court (Ground Ten, Pet. at

17); (11) the trial court erred in permitting the prosecutor to cross-examine petitioner on his use

of 26 aliases because he had not received notice of the prosecution's intent to use such evidence

to impeach him and the evidence had not been ruled admissible during a conference held

pursuant to *People v. Sandoval* (Ground Eleven, Pet. at 18); (12) petitioner was "deprived of his right to due process of law on appeal" by the appellate court's "failure to follow the law" (Ground Twelve, Pet. at 20); and (13) the trial court erred in "denying his requests for alternative measures to prevent the People from conducting a show up identification of [petitioner] in court" by the victim and (Ground Fourteen,[2] Pet. at 24).

For the reasons set forth below, the Court recommends that a writ of habeas corpus be denied and that the petition be dismissed.

## III.   Discussion

## A.   Standard of Review

The filing of Brazeau's petition post-dates the April 24, 1996 enactment of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") and therefore is governed by that statute's amendments to 28 U.S.C. § 2254.  When a state court has adjudicated a habeas petitioner's claims on the merits, habeas relief may not be granted unless the state court's holding was contrary to, or was an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or was based on unreasonable determination of the facts in light of the evidence presented in petitioner's state court proceeding. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (*per curiam*); *see also Williams v. Taylor*, 529 U.S. at 409  (2000). AEDPA has "significantly curtailed the power  of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir.

---

[2]       The petition does not contain a Ground Thirteen.

2001) (citing *Williams v. Taylor*, 529 U.S. at 399). In order to grant the writ under AEDPA there

must be "some increment of incorrectness beyond error," although "the increment need not be

great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to

suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal

quotation marks omitted).

**B.      Analysis of Claims Raised in the Petition**

      **Ground One:  The trial court lacked jurisdiction over petitioner.**

      As his first ground for relief, Brazeau asserts that the trial court "did not have jurisdiction

to sentence petitioner as no evidence was presented to the grand jury to support the

indictment[.]" Pet., ¶22(A) (Dkt. #1). He alleges that the victim's purported failure in his grand

jury testimony to "mention [petitioner's] name or accuse [petitioner] of committing any act

towards or upon him" rendered the indictment fatally defective.

      As respondent argues, to the extent that Brazeau is asserting defects in the grand jury

proceeding, such a claim is not cognizable on habeas review because he was convicted by a jury

after a trial. The trial jury's guilty verdict necessarily renders any irregularities before the grand

jury harmless as it establishes not only that there existed probable cause to indict the defendant,

but also that the defendant was "in fact guilty as charged beyond a reasonable doubt." *United

States v. Mechanik*, 475 U.S. 66, 68 (1986); *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989)

(holding that habeas petitioner's "claims of impropriety before the grand jury in this case

concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the

prosecutor, the presentation of prejudicial evidence and error in explaining the law" . . . were

"cured in the trial before the petit jury, which convicted"). Accordingly, this claim is not

-11-

cognizable on habeas review and the Court recommends dismissing it on that basis.

**Ground Two:  The prosecutor knowingly suborned perjury in the grand jury.**

Brazeau contends that the prosecutor knowingly presented false testimony to the grand jury. In particular, he contends that the grand jury "was led to believe by way of leading questions to Detective Booze that John Barrus, the alleged victim in this matter, filed a complaint against" petitioner. Pet. at 19 (Dkt #1). He further asserts that eyewitnesses Barrus never identified petitioner as the perpetrator, either to the police or before the grand jury, and "never stated to the grand jury that anyone took anything from him, or threatened him, or asked him for any property." *Id.* Brazeau reasons that Barrus never actually reported a crime to the police because he did not identify Brazeau by name or utter the talismanic words "robbery" or "assault" when he described the attack to Detective Booze. Therefore, according to Brazeau, Detective "made up" the incident and became the "sole complainant," Pet. at 19 (Dkt. #1), against him.

Not only is this claim factually baseless and premised on a distorted reading of the grand jury and trial testimony of both Detective Booze and the victim, it is also not cognizable on habeas review because it asserts only that errors allegedly occurred at the grand jury proceeding. *Lopez v. Riley*, 865 F.2d at 32 (citing *United States v. Mechanik*, 475 U.S. at 68). The Court therefore recommends that it be dismissed both as factually baseless and not cognizable on federal habeas review.

**Ground Three:      The evidence presented to the grand jury was insufficient to support the indictment**.

Brazeau argues that the trial court erred when it found that there was sufficient evidence before the grand jury to support the indictment and that the legal instructions given to

the jury were adequate and proper. *See* Pet. at 9 (Dkt #1). Because alleged errors in a state grand

jury proceedings raise no federal constitutional issues, this claim is not cognizable on habeas

review. *Lopez*, 865 F.2d at 32 (citing *Mechanik*, 475 U.S. at 68). Accordingly, the Court

recommends that this claim be dismissed as not cognizable on federal habeas review. *Accord*,

*e.g.*, *Pena v. Fischer*, No. 00 Civ. 5984 HBMHD, 2003 WL 1990331, *7 (S.D.N.Y. Apr. 30,

2003) (dismissing petitioner's claim that the grand jury evidence was insufficient to support the

indictment as not raising a federal constitutional claim cognizable on habeas review).

**Ground Four:**          **Petitioner's arrest was without probable cause.**

Brazeau asserts that he is entitled to a writ of habeas corpus because the police lacked

probable cause to arrest him. *See* Pet. at 10 (Dkt #1).  As respondent argues, this alleged violation

of petitioner's Fourth Amendment rights is not cognizable on federal habeas review under the

doctrine articulated in *Stone v. Powell*, 428 U.S. 465 (1976).

In *Stone v. Powell*, the Supreme Court held that "where the State has provided an

*opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not

require that a state prisoner be granted federal habeas corpus relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481-82.

(emphasis added). In *Gates v. Henderson*, 568 F.2d 830 (2d Cir.1977) (*en banc*), *cert. denied*,

434 U.S. 1038 (1978)), the Second Circuit developed a "litmus test" for determining when a

petitioner has denied an "opportunity" for a "full and fair litigation of his fourth amendment

claims." *Gates*, 568 F.3d at 839, 840; *accord Capellan v. Riley*, 975 F.2d 67, 69-71 (2d

Cir.1992); *see also McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 70 (2d

Cir.1983). The Second Circuit concluded, in light of the Supreme Court's holding in *Powell* that

the state is only required provide the "opportunity"to the state prisoner for a full and fair

litigation of the Fourth Amendment claim, that review of Fourth Amendment claims presented

by habeas petitioners would be undertaken in only one of two instances. First, habeas review of

Fourth Amendment claims would be warranted "if the State provided no corrective procedures at

all to redress the alleged Fourth Amendment violations." *Capellan*, 975 F.2d at (quoting *Gates*,

568 F.2d at 840 and citing *McPhail*, 707 F.2d at 70). Second, "if the State has provided a

corrective mechanism, but the defendant was precluded from using that mechanism because of

an 'unconscionable breakdown in the underlying process,'" the habeas court should undertake

habeas review. *Id.* (quoting *Gates*, 568 F.2d at 840); *accord Graham v. Costello*, 299 F.3d 129,

134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his

or her Fourth Amendment claim (whether or not he or she took advantage of the state's

procedure), the court's denial of the claim is a conclusive determination that the claim will never

present a valid basis for federal habeas relief. . . . [T]he bar to federal habeas review of Fourth

Amendment claims is permanent and incurable absent a showing that the state failed to provide a

full and fair opportunity to litigate the claim[.]").

Notably, all that must be shown is that the State has provided an opportunity to litigate

the petitioner's Fourth Amendment claim; it matters not whether the petitioner actually "took

advantage of the State's procedure." *Graham*, 299 F.3d at 134. Brazeau does not, and cannot

contend that New York failed to provide a corrective procedure to redress his alleged Fourth

Amendment claim.  This is because he took advantage of the opportunity to challenge the legality

of his arrest by means of New York's procedure for litigating Fourth Amendment claims,

embodied in New York Criminal Procedure Law § 7 10. 10 *et seq.*, which has been held by

federal courts in New York to be "'facially adequate.'" *Capellan*, 975 F.2d at 70 n. 1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at 837 & n. 4; *Shaw v. Scully*, 654 F.Supp. 859, 864 (S.D.N.Y. 1987)). Rather, Brazeau asserts that the state courts erroneously decided his motion to suppress, and he is requesting that this Court conduct a *de novo* factual review of his claims. The relief requested, however, is expressly forbidden by the *Stone v. Powell* doctrine, as the Second Circuit has explained many times: A petitioner's mere dissatisfaction or disagreement with the outcome of a suppression motion is not sufficient to establish that an "unconscionable breakdown" occurred in the existing process in violation of the petitioner's Fourth Amendment rights under the Constitution. *Capellan*, 975 F.2d at 71 ("[T]o the extent that [petitioner] claims that the Appellate Division erred in its ruling . . . , this would not give us authority to review his claims since a mere disagreement with the outcome of a state court ruling is *not the equivalent* of an unconscionable breakdown in the state's corrective process.") (emphasis supplied); *Gates v. Henderson*, 568 F.2d at 840 ("*Stone v. Powell* . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts.").

The Second Circuit has explicitly rejected the possibility of interpreting *Stone v. Powell* to require the reviewing court to focus on the correctness of the state court's corrective procedures for adjudicating Fourth Amendment claims, rather than on the existence and application of the corrective procedures themselves. According to the Second Circuit, to subject a habeas petitioner's previously litigated Fourth Amendment claims to further federal review would be to assume, "implicitly at least, that state courts were not responsible forums in which to bring constitutional claims such as is presented herein." *Capellan*, 975 F.2d at 71. *Stone v.*

*Powell*, however, "expressly discouraged" it from making such an assumption. *Id.* (citing *Powell*, 428 U.S. at 493-94 n. 35) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States.").

Here, as noted above, Brazeau took full advantage of the available state process by presenting his Fourth Amendment claim at both the suppression hearing and in his briefs to the state appellate courts. Brazeau contends, however, that he is entitled to further review of his claims because the trial court's erroneous fact-finding and refusal to consider the pertinent issues during the suppression hearing constituted an "unconscionable breakdown" in state process. Although the Second Circuit has not defined precisely when an unconscionable breakdown has occurred, it observed in *Capellan* that its citations in *Gates v. Henderson* to *Frank v. Mangum*, 237 U.S. 309 (1915),[3] and to Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 HARV. L. REV. 441 (1963), "illustrate the sort of 'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown." *Capellan*, 975 F.2d at 70 (citing *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y.1987); *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y.), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (*per curiam*)). As the district court pointedly observed in *Cappiello v. Hoke*, "an unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." 698 F.

---

[3]     In *Frank v. Magnum,* the Supreme Court affirmed the denial of a petition for a writ of habeas corpus despite the petitioner's contention that his murder trial was dominated by an angry mob. *See* 237 U.S. at 324. Because the state forum had provided adequate procedures to remedy these alleged due process violations, however, due process had not been denied, and federal collateral review was unwarranted. *Id.* at 335-36.

Supp. at 1050. Clearly, then, a petitioner's mere disagreement with the outcome of the state

courts' rulings "is not the equivalent of an unconscionable breakdown in the state's corrective

process." *Capellan*, 975 F.2d at 72; *accord, e.g.*, *Watkins v. Perez*, No. 05 Civ. 477(GEL), 2007

WL 1344163, *23 (S.D.N.Y. May 30, 2007) (holding that without more, rejection by state

appellate court of petitioner's Fourth Amendment claims, is not an "conscionable breakdown" in

the state's corrective process; noting that a "habeas court cannot grant relief simply because it

may disagree with the state court's resolution of the claim"); *Woods v. Kuhlmann*, 677 F. Supp.

1302, 1306 (S.D.N.Y. 1988) ("The doctrine of *Stone v. Powell*, however, forbids *de novo* review

of state court fact-finding on a Fourth Amendment issue particularly where, as here, the

petitioner can claim only that the issue was wrongly decided."); *Huntley v. Superintendent*, No.

9:00CV191, 2007 WL 319846, at *8 (N.D.N.Y. Jan. 30, 2007); *Gonzalez v. Superintendent,*

*Sullivan Corr. Fac.*, 761 F. Supp. 973, *977 (E.D.N.Y. 1991) (rejecting habeas petitioner's claim

that state court denied his request for a probable cause hearing insufficient facts asserted to

warrant such a hearing was  "unconscionable breakdown" in the process afforded by the state;

petitioner was provided, as mandated by Stone, with a full and fair opportunity to litigate his

fourth amendment claim in the state courts and "[t]he fact that petitioner was denied his request

for such a hearing does not, in and of itself, affect the legitimacy of the state process").

After a careful review of the record in Brazeau's case, the Court cannot find evidence of

an "unconscionable breakdown" of the Fourth Amendment process afforded him. Rather,

Brazeau can claim only that, in his opinion, the Fourth Amendment issues were incorrectly

decided by the state courts. The Second Circuit clearly has held that a petitioner's mere

disagreement with the state courts' rulings on his Fourth Amendment issues does not suffice to

demonstrate that some type of governmental obstruction amounting to an "unconscionable breakdown" in the state's corrective procedures prevented him from fully and fairly litigating his Fourth Amendment claims. *Capellan*, 975 F.2d at 72. Because Brazeau can show nothing more than that he disputes the correctness of the state court's rulings, the doctrine of *Stone v. Powell* forbids *de novo* review of any state court fact-finding on such issues.

For all of the foregoing reasons, federal habeas review of Brazeau's Fourth Amendment claim regarding his arrest is unavailable under the doctrine of *Stone v. Powell*, *supra*. Accordingly, the Court recommends that this claim be dismissed.

**Ground Five:**     **The police committed misconduct in connection with the warrant for petitioner's arrest.**

Brazeau claims Detective Booze, the police officer who took his statement and arrested him, violated his Fourth and Fourteenth Amendment rights by "filing a false and misleading information/complaint" against him, "thereby materially misleading the Court on the basis for a finding of probable cause/reasonable cause." Pet. at 11 (Dkt. #1). Respondent contends that this claim merely alleges a violation of Brazeau's Fourth Amendment rights and therefore is not cognizable on federal habeas review pursuant to *Stone v. Powell*, *supra*.  For all the reasons stated above in its discussion of Ground Four of the petition, the Court agrees with respondent that to the extent that Brazeau is asserting that a violation of his Fourth Amendment rights because his arrest was not based upon probable cause, such a claim is not cognizable on federal habeas review. *See Stone v. Powell*, *supra*; *Capellan v. Riley, supra*.

Brazeau does not specify how his Fourteenth Amendment rights were violated by Detective Booze. Giving a generous construction to Brazeau's *pro se* pleadings, *see Haines v.*

*Kerner*, 404 U.S. 519, 520 (1972) (*per curiam*) (holding that the allegations in a *pro se* complaint

are "h[e]ld to less stringent standards than formal pleadings drafted by lawyers"), the Court infers

that petitioner may be asserting a claim of malicious prosecution against Detective Booze. *See*

*Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir.  2003) ("Claims for . . . malicious prosecution,

brought under [42 U.S.C.] § 1983 to vindicate the Fourth and Fourteenth Amendment right to be

free from unreasonable seizures, are 'substantially the same' as claims for . . . malicious

prosecution under [New York] state law.") (citations omitted); *see also Savino v. City of New*

*York*, 331 F.3d 63, 72 (2d Cir. 2003).  "A malicious prosecution claim under New York law

requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against

plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'"

*Jocks v. Tavernier*, 316 F.3d at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)

(internal quotation marks omitted in original)).

    Any putative claim of malicious prosecution by Brazeau should fail for the following

reasons. First, since Brazeau was convicted after a jury trial, the criminal proceeding against him

did not terminate "in his favor," *Jocks*, 316 F.3d at 136. Second, Brazeau cannot demonstrate a

lack of probable cause for commencing the proceeding. The grand jury's decision to indict him

"creates a presumption of probable cause" to prosecute him for the crimes at issue. *Rothstein v.*

*Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004) (quotation omitted). Furthermore, the trial jury's

verdict of guilty establishes that not only was there probable cause to indict him, there was

evidence sufficient to prove his guilt beyond a reasonable doubt. *See United States v. Mechanik*,

*supra*; *Lopez v. Riley*, *supra*.  The Court will disregard that obstacle for the moment and consider

Brazeau's implicit claim that he can overcome this presumption of probable cause because the police witnesses allegedly "have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, [or] that they have withheld evidence or otherwise acted in bad faith.'" *Rothstein v. Carriere*, 373 F.3d at 283 (quoting *Colon v. City of New York*, 60 N.Y.2d at 82-83). With respect to these claims, Brazeau must present more than "mere conjecture" or "surmise" that his indictment was procured as a result of conduct undertaken by the defendants in bad faith to rebut the presumption of probable cause. *Savino v. City of New York*, 331 F.3d at 72. According to Brazeau, his claim of police misconduct is

> based on . . . Detective [Booze]'s own admissions at the *Huntley*/probable cause hearings and upon cross-examination at trial which were, that John Barrus never stated to her that he was robbed or assaulted by anyone and [petitioner] was never identified by way of line-up, photo array, or any other procedures and her admissions that Barrus did not claim to know me, and that it was all just her opinon that a robbery and assault occurred and that [petitioner] was the one who did the criminal act.

Pet. at 11 (Dkt. #1). This claim repeats Brazeau's familiar theme–that the victim's failure to identify his attacker by name and failure to specifically say to the police the words, "I was robbed and assaulted by Michael Brazeau" means that there was no evidence to indict Brazeau, let alone convict him. As discussed elsewhere in this Report and Recommendation–in particular, the portion dealing with Brazeau's claim of insufficient evidence to support the guilty verdict–Brazeau's reasoning is based on a skewed reading of the witnesses' statements both at trial and before the grand jury and is not supported by the record.

Brazeau's argument boils down to a "swearing contest" between him and the prosecution's witnesses. However, conflicting testimony between the malicious prosecution

claimant and the police defendants and other prosecution witnesses is insufficient to rebut the

presumption of probable cause. *Hill v. Melvin*, No. 05 CIV. 6645 (AJP), 2006 WL 1749520, at

*14 (S.D.N.Y.  June 27, 2006) (citing *Brogdon v. City of New Rochelle*, 200 F. Supp.2d 411, 422

(S.D.N.Y. 2002) ("The record is barren of evidence (as opposed to conclusory allegations) to

overcome the presumption created by the indictment. [Plaintiff] asserts that [the police officer]

perjured himself, but that conclusory allegation is insufficient to overcome this strong

presumption. . . . [Moreover,] [t]he existence of a 'swearing contest' between plaintiff as to his

innocence and an eyewitness as to the events cannot of itself render the issue of probable cause a

jury question.") (quotation and internal quotation marks omitted); *DiMascio v. City of Albany*,

No. 93-CV-0452, 1999 WL 244648 at *3 (N.D.N.Y. Apr. 21, 1999) (contradictions between

plaintiff's and defendant's trial testimony "is insufficient to give rise to an inference of fraud,

perjury or the withholding of evidence and is probative of little more than a disagreement over

the turn of events" on the date of plaintiff's arrest.), *aff'd*, 205 F.3d 1322 (2d Cir. 2000);

*Hathaway v. County of Essex*, 995 F. Supp. 62, 69 (N.D.N.Y. 1998) ("Reliance on variations in

testimony . . . as evidence of fraud, suppression of evidence, or perjury [is] insufficient to

overcome the presumption of probable cause."), *aff'd*, 172 F.3d 37 (2d Cir.), *cert. denied*, 528

U.S. 894 (1999)).

　　　　To establish that Detective Booze committed perjury before the grand jury sufficient to

overcome the presumption of the existence of probable cause, Brazeau would have had "'to

submit evidence in admissible form which establishes that those witnesses willfully and corruptly

gave false testimony under oath as to a matter material to the issue or point in question.'"

*Brogdon*, 200 F. Supp.2d at 422 (quoting *Scheiner v. Wallace*, No. 93 Civ. 0062, 1996 WL

633418, at *8 (S.D.N.Y. Oct. 31 1996) (in turn citing N.Y. Penal Law §§ 210.50, 210.15 and

*People v. Davis*, 53 N.Y.2d 164 (N.Y. 1981)) and citing *Boomer v. Bruno*, 134 F. Supp.2d 262,

268 (N.D.N.Y. 2001)). This Brazeau has failed to do;  all he has presented are allegations based

not on any admissible evidence but rather on his self-serving mischaracterization of the record.

The fact that Brazeau's version of the incident contradicts that of Detective Booze is not enough

to present an issue of fact as to the probable cause element of his malicious prosecution claim. "If

it were, any time there were conflicting versions of an incident and the criminal trial resulted in a

not guilty verdict, the arresting officers could be sued for malicious prosecution, despite a grand

jury finding of probable cause." *Hill v. Melvin*, 2006 WL 1749520, at *14.

Finally, Brazeau fails the fourth prong of a malicious prosecution claim–proving actual

malice. "Under New York law, malice does not have to be actual spite or hatred, but means only

'that the defendant must have commenced the criminal proceeding due to a wrong or improper

motive, something other than a desire to see the ends of justice served.'"  *Lowth v. Town of*

*Cheektowaga*, 82 F.3d 563, 573 (2d Cir.1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500,

502-03 (N.Y. 1978)). Brazeau has not alleged, let alone come forward with any actual evidence

that, Detective Booze and the rest of the police department initiated the criminal proceeding

against him out of "actual malice." The only possible basis for inferring malice that this Court

can discern from Brazeau's pleadings are–again–his conclusory assertions that the victim and the

police officer lied, and that he is innocent. However, the Second Circuit has held that "police

officers, when making a probable cause determination, are entitled to rely on the victims'

allegations that a crime has been committed." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.

2000). Once a police officer has a "reasonable basis for believing there is probable cause [to

arrest], he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (finding probable cause where the arresting officer chose to believe the claimed victim's account of a fight based on his visible injuries, notwithstanding the alleged assailant's cries of innocence); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (finding probable cause where a police officer was presented with different stories from an alleged victim and the arrestee). A review of Brazeau's and the victim's statements to the police, as detailed elsewhere in this Report and Recommendation, makes clear that Detective Booze had more than a "reasonable basis" for believing that probable cause existed to arrest Brazeau.

For all of the foregoing reasons, the Court recommends finding that to the extent Brazeau may be asserting a claim of malicious prosecution against the police, it should be dismissed because Brazeau has failed to establish any of the elements required to state a *prima facie* claim.

**Ground Six:   The evidence was insufficient to support the jury's guilty verdict.**

As his sixth ground for habeas relief, Brazeau attacks the sufficiency of the evidence supporting his convictions for second degree assault and second degree robbery. According to petitioner, the "People presented no evidence and there was no evidence in the record to establish that whom ever [sic] the bald headed man was described by John Barrus that this person conceived the intent to rob him and there was no evidence presented by the people that I took any property from John Barrus." Pet. at 12 (Dkt. #1).

The law in concerning the sufficiency of the evidence is well settled: The reviewing court's inquiry is limited to asking whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis

in original); *accord*, *e.g*, *People v. Contes*, 60 N.Y.2d 620, 621 (N.Y. 1983).  Under the *Jackson*

standard for reviewing evidentiary sufficiency, "the assessment of the credibility of witnesses is

generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *accord*

*Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the

evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas]

appeal."); *United States v. Vasquez*, 267 F.3d 79 (2d Cir. 2001) ("The jury chose to believe the

witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of

credibility.") (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("Where there is

conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility.")

(citing *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir. 1985)); *Glasser v. United States*, 315

U.S. 60, 80 (1942) ("It is not for us to weigh the evidence or to determine the credibility of

witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view

most favorable to the Government, to support it."), *superseded on other grounds by statute*, *in*

*part*, *as recognized in Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *Gruttola v.*

*Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) ("The jury chose to believe the State's witnesses,

despite the inconsistencies in the evidence . . . . We cannot say that no rational jury could have

found guilt beyond a reasonable doubt on all the evidence.").

   In considering the sufficiency of the evidence of a state conviction, "[a] federal court

must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186

F.3d 91, 97 (2d Cir. 1999), *cert. denied*, 528 U.S. 1170 (2000). Brazeau was convicted of robbery

in the second degree (N.Y. Penal Law § 160.10(2)(a)) and assault in the second degree (N.Y.

Penal Law N.Y. § 120.05). However, the only argument Brazeau presents in his habeas petition concerns the sufficiency of the evidence supporting the robbery conviction, *see* Pet. at 12 (Dkt. #1). Under New York law, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when[,] . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime[.]" N.Y. Penal Law § 160.10(2)(a).

Brazeau contends that there was no evidence that any of the property stolen from the victim was ever found to be in his possession. *See id.* The prosecution, however, was not required to prove that Brazeau "exercised . . . dominion or control," Pet. at 12 (Dkt. #1), of the stolen property as an element second degree robbery. *See* N.Y. Penal Law § 160.10(2).

Brazeau also contends that the prosecution failed to prove that there was a "forcible stealing of property" from the victim because "not one witness testified . . . including [the victim], that they saw or witnessed [him] use or threaten the immediate use of physical force upon [the victim]." *Id.* (Dkt. #1). Contrary to Brazeau's contention, however, the victim did testify that he witnessed Brazeau "threaten the immediate use of physical force upon" him, as detailed more fully below.  The victim testified that a "big, bald, white" male who was playing pool for Wagner's Bar verbally harassed him at Rascal's Bar. After the victim left the bar because of Brazeau's antagonistic conduct, the same "big, bald, white" man stuck his head out of the doorway of the bar and yelled after him. Moments later, the same "big, bald, white" man appeared at the victim's side as he was walking towards home through the Wilson Farms parking lot. The "big, bald, white" man acted friendly towards him, and asked him to go have a beer at his (*i.e.*, Brazeau's) house on 25th Street; Brazeau stated that he did, in fact, live on 25th Street.

The victim declined the offer to go have a beer; the next thing he recalled was coming to in the

alley in a disoriented and painful state. The victim testified that he knew Brazeau had struck him

because he saw the blow coming from the left side, the side on which  Brazeau had been

walking. T.339. The victim and Brazeau were the only two individuals in the vicinity at the time

of the incident. All of the victim's money was gone, along with some of his personal effects, and

he had sustained a number of injuries: he sprained his right ankle, sustained bruising on the left

side of his face, and had three teeth knocked loose, which caused lacerations to both the top and

bottom of his mouth.

 In addition, the two owners of Rascal's Bar, Fred and Ann Grace, along with Joy Vail,

the manager for Wagner's Bar, testified that there was nobody else that looked like Brazeau at

Rascal's Bar on the night of the incident. Brazeau admitted that he was at Rascal's Bar on the

night in question and that he was playing pool for Wagner's Bar. Joy Vail, who played on the

Wagner's team with Brazeau, testified that Brazeau was the only "big bald white guy" on their

team that night. Fred Grace testified that the victim told him that he was leaving the bar because

he was being harassed and he did not want any trouble. Ann Grace testified that the victim asked

her twice to ask Brazeau to leave her alone, and that moments after the victim left the bar,

Brazeau left as well and headed in the same direction as the victim. All of these individuals

unhesitatingly identified Brazeau at trial, despite his efforts to change his appearance by allowing

his hair to grow and wearing a longer goatee on the day they made their identifications of him in

court.

The law is well-settled that "[a] jury's verdict 'may be based entirely on circumstantial

evidence[.]'" *Dixon v. Miller*, 293 F.3d 74, 82 (2d Cir. 2002) (quoting *United States Martinez*, 54

F.3d 1040, 1043 (2d Cir. 1995) (other citations omitted)). Here, however, the prosecution presented both direct evidence of Brazeau's guilt–through the unimpeached testimony of the victim–as well as circumstantial evidence. Where a fact sought to be proven by permissible inferences is also an element of the offense charged, however, the reviewing court "'must . . . be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.'" *Id.* (quoting *Martinez*, 54 F.3d at 1043) (other citations omitted)). After reviewing all of the evidence presented at Brazeau's trial, it is clear that the inferences to be drawn from prosecution's evidence logically and compellingly support the conclusion that Brazeau was the individual who punched the victim in the left side of his face, causing him to sustain multiple injuries and to lose consciousness, and then took his money and his keys. The jury was presented with ample evidence to support its conclusion that the prosecution had proven the necessary elements of robbery beyond a reasonable doubt–namely, that Brazeau forcibly stole money from the victim and caused injury to him during the commission of that crime. In sum, Brazeau has failed to prove that no rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found all of the essential elements of the crimes charged beyond a reasonable doubt. Indeed, after reviewing the trial transcript in its entirety, the Court is convinced that the proof against Brazeau was overwhelming. Accordingly, the Court recommends that Brazeau's claim that the evidence was insufficient to support his conviction be denied.

**Ground Seven: Prosecutorial misconduct deprived petitioner of a fair trial.**

Brazeau's seventh argument in support of his habeas petition is that the "prosecutor's misconduct permeated and tainted every aspect" of his trial, "resulting in prejudice which could

not [sic] and was not eliminated or ameliorated by any curative instructions." Pet. at 13 (Dkt. #1).

Brazeau ascribes the following errors to the prosecutor: (1) "repeatedly and impermissibly

bolstering an identification of [him] in her  opening statement that she knew . . . never had priorly

[sic] occurred"; (2) making "comments upon matters not in evidence" and going "beyond the

four corners of evidence during her summation"; (3) stating that petitioner "lied"; and (4)

"inappropriately address[ing] [a] juror" during summation. Pet. at 13 (citing T.233-34; 239; 779-

80) (Dkt #1). When Brazeau asserted these claims on direct appeal, the Appellate Division held

that

> [c]ontrary to the further contention of defendant, he was not denied a fair trial by
> prosecutorial misconduct. Defendant failed to object to most of the challenged
> statements and thus failed to preserve his contentions with respect to those
> statements for our review (*see* CPL 470.05(2)). In any event, although the
> prosecutor improperly stated that defendant "lied" to certain witnesses, that
> isolated statement was not so egregious as to deprive defendant of a fair trial[.]

*People v. Brazeau*, 304 A.D.2d at 257 (internal and other citations omitted). Respondent has

asserted the affirmative defense of procedural default with regard to the claims of prosecutorial

misconduct held to be unpreserved for review by the Appellate Division  Resp't Mem. at 6 (Dkt

#4) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991). As to the one comment held to

be preserved, respondent asserts that petitioner has failed to demonstrate substantial prejudice as

a result of the alleged procedural misconduct. *Id.* (Dkt. #4).

     For the reasons set forth below, the Court recommends that Brazeau's claims regarding

comments to which he did not object at trial are procedurally defaulted under the "adequate and

independent" state ground doctrine, *see, e.g.*, *Coleman v. Thompson*, 501 U.S. at 729-31. The

Supreme Court has held that federal courts shall "not review a question of federal law decided by

a state court if the decision of that court rests on a state law ground," be it substantive or

procedural, that is "independent of the federal question and adequate to support the judgment."

*Coleman v. Thompson*, 501 U.S. at 729 (citations omitted). An adequate and independent finding

of procedural default precludes federal habeas review of the federal claim, unless the habeas

petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray v.*

*Carrier*, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim

on habeas will result in a  "fundamental miscarriage of justice,'" *id.* at 495 (quoting *Engle v.*

*Isaac*, 456 U.S. 107, 135 (1982)).

However, federal review is precluded under this doctrine only when the state ground is

both an "independent" basis for, and "adequate" to support the decision. *See Harris v. Reed*, 489

U.S. 255, 261-62 (1989); *accord*, *e.g.*, *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006).

"The state court must actually have relied on the procedural bar as an independent basis for its

disposition of the case," *Harris*, 489 U.S. at 261-62. For a state ground to be considered

"independent," it must be "clear from the face of the opinion" that the court intended to rely on

the state rule in disposing of the federal claim. *Coleman*, 501 U.S. at 735 (quotation marks

omitted); *accord*, *e.g.*, *Messiah*, 435 F.3d at 195.  "[A] procedural bar will be deemed 'adequate'

only if it is based on a rule that is 'firmly established and regularly followed' by the state in

question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S.

411, 423-24 (1991)). Whether application of the procedural rule is "'firmly established and

regularly followed'" must be judged in the context of "the specific circumstances presented in the

case," and "of the asserted state interest in applying the procedural rule in such circumstances."

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362, 386-87

(2002)). The Second Circuit has directed reviewing courts to determine the adequacy of the procedural bar by examine the circumstances of the case, directed by the following the three factors, or "guideposts," used by the Supreme Court in *Lee v. Kemna*, 532 U.S. at 381-85: (1) whether the alleged procedural violation was actually relied on in the state court, and whether perfect compliance with the state rule would have changed the state court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner has "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 381-85).

Here, the Appellate Division's reliance upon New York Criminal Procedure Law ("C.P.L.") § 470.05(2), which required Brazeau to specifically object to the alleged instances of prosecutorial misconduct at trial in order to preserve the alleged errors for appellate review, clearly was an independent basis for its decision. Moreover, it was a fully adequate state basis for the state court's decision rejecting Brazeau's claims of prosecutorial misconduct as unpreserved. It is settled law in New York state that in order to preserve for appellate review a claim that a prosecutor committed misconduct at trial, a defendant must register a timely, specific objection to each instance of impropriety with the trial court pursuant to C.P.L. § 470.05(2). The defendant's failure to do so renders the claims unpreserved and leaves the appellate court no basis to review the alleged prosecutorial misconduct. *E.g.*, *People v. Williams*, 8 N.Y.3d 854, 855 (N.Y. 2007); *People v. Miles*, 36 A.D.3d 1021, 27 N.Y.S.2d 348, 351 (App. Div. 3d Dept. 2007); *People v. Davenport*, 35 A.D.3d 1277, 825 N.Y.S.2d 864, 865 (App. Div. 4th Dept. 2006);

*People v. Aponte*, 28 A.D.3d 672, 813 N.Y.S.2d 224, 225 (App. Div. 2d  Dept. 2006); *People v. Jackson*, 304 A.D.2d 327, 328, 756 N.Y.S.2d 580, 582 (App. Div. 1st Dept. 2003).

New York appellate courts consistently demand fairly strict compliance with the rule, as the foregoing New York precedent makes clear. Furthermore, Brazeau completely failed to comply with the procedural rule. Thus, the procedural bar relied upon by the appellate court in this case was "firmly established and regularly followed," and therefore constitutes an adequate state ground barring review of the merits of Brazeau's claim. *Accord Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir.1996) (holding that appellate division rejected petitioner's claim of prosecutorial misconduct on an adequate and independent state ground where it ruled that because petitioner did not object to the prosecutor's racist, he did not preserve the argument for review, and then went on to discuss the merits of the due process claim); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (same); *Jenkins v. Unger*, No. 9:03-CV-1172 (LEK/DRH), 2007 WL 911889, *11 (N.D.N.Y.  Mar. 22, 2007) (appellate division rejected petitioner's prosecutorial misconduct claim, stating that "his claims of prosecutorial misconduct, based upon the elicitation of certain testimony and summation remarks, were not preserved by appropriate objection[;]" holding that New York's contemporaneous objection rule was an "adequate and independent" state ground for procedural default where defense counsel has failed to object to a prosecutor's misconduct").

Where a state court has clearly and expressly stated that its judgment rested on a state procedural bar, a federal court may not review the claim unless the petitioner demonstrates both cause for the procedural default and resulting prejudice, or alternatively, that a fundamental miscarriage of justice would occur absent federal court review. *Dixon*, 293 F.3d at 80-81 (citation

omitted); *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d Cir. 2004) ("In the case of procedural

default . . . [federal courts] may reach the merits of the claim 'only if the defendant can first

demonstrate either cause and actual prejudice, or that he is actually innocent.'") (quoting *Bousley*

*v. United States*, 523 U.S. 614, 622 (1998)) (other citations omitted). Brazeau may avoid the

preclusive effect of this procedural default by showing cause for the default and actual prejudice

as a result of the alleged violation of federal law, or that failure to consider the claim will result

in miscarriage of justice, *i.e.*, the petitioner is actually innocent. *See Coleman*, 501 U.S. at 748;

*Murray v. Carrier*, 477 U.S. at 496.

Brazeau has not alleged cause for the default or prejudice resulting therefrom. The Court

notes that Brazeau, a layperson, represented himself at trial. Although was proceeding *pro se* at

trial, he has not asserted that he was prevented from complying with the contemporaneous

objection rule due to ignorance of the rule or lack of familiarity with the law in general. Even if

he did, the Court would not agree that, under the circumstances here, such ignorance amounted to

"good cause" to excuse the procedural default. *See Graham v. Leonardo*, 166 F.3d 1200, 1998

WL 852942, at *2 (2d Cir. 2000) "[I]ignorance does not constitute good cause excusing

procedural default in these kinds of circumstances." ) (unpublished opinion) (citing *Washington*

*v. James*, 996 F.2d 1442, 1447 (2d Cir. 1993)); *see also Patch v. United States*, 1998 WL

527315, *1 (2d Cir. 1988) ("Patch provides two justifications for his failure to bring his direct

appeal: (1) his 'lack of education and unfamiliarity with the U.S. judicial system' and (2) the

ineffective assistance provided by his trial counsel. The first of these reasons is an insufficient

justification.") (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994), for a "listing [of] the

types of reasons that could represent cause[,]" namely, ); *DeVivo v. Superintendent, Auburn*

*Corr. Facility*, 2006 WL 581145, *7 (N.D.N.Y.  Mar. 8, 2006) ("DeVivo has not established

cause for his failure to assert any of the procedurally defaulted claims in his *pro se*  appellate

brief.").

Even assuming for the sake of argument that Brazeau's status a *pro se* litigant unversed in

the law could constitute "cause" to excuse the procedural default, he cannot satisfy the

"prejudice" prong of the *Coleman* test. To demonstrate that prejudice, a petitioner must show not

merely a possibility of prejudice, but that the alleged error worked to his actual and substantial

disadvantage." *Capiello v. Hoke*, 698 F.Supp. at 1052 (internal quotation marks and citation

omitted). In light of the overwhelming evidence of his guilt, Brazeau is unable to show that he

was disadvantaged by the alleged errors. There is no reasonable possibility that the outcome of

his trial would have been any different had the prosecutor not made the remarks about which

Brazeau complains. Accordingly, Brazeau he is unable to satisfy the "prejudice" prong of the

*Coleman* test as well.

Nor can Brazeau take advantage of the "fundamental miscarriage of justice" exception to

the procedural default rule, which the Supreme Court has explained is "extremely rare" and

should be applied only in "extraordinary cases." *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995);

*accord Sweet v. Bennett*, 353 F.3d 135, 142 (2d Cir. 2003). To establish "actual innocence" for

purposes of satisfy the fundamental miscarriage of justice exception, a petitioner must show that

in light of all of the evidence available, "it is more likely than not that no reasonable juror would

have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327, 328; accord

*Bousley*, 523 U.S. at 623).  Apart from Brazeau's own self-serving protestations of innocence, he

has not come forward with any evidence of his "actual innocence."

Brazeau has failed to fulfill the requirements of the "cause and prejudice" exception or the "fundamental miscarriage of justice" exception to the procedural bar created by the state court's reliance upon an adequate and independent state ground. Therefore, he should be precluded from pressing this claim regarding the prosecutor's alleged misconduct at trial and before the grand jury on habeas review. The Court accordingly recommends dismissing the claims as procedurally barred from federal habeas review.

In the alternative, the Court recommends dismissing the claims based on the three comments by the prosecutor as unpreserved and without merit. Both the Second Circuit and the Supreme Court have "note[d] the narrow standard governing federal habeas corpus review of a petition brought by a state prisoner," which appropriately is "'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *accord, e.g.*, *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990). The Supreme Court accordingly has instructed federal habeas courts reviewing claims of prosecutorial misconduct brought by state petitioners to distinguish between the "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount [ing] to a denial of constitutional due process." *Donnelly*, 416 U.S. at 647-48  (citations omitted); *accord Floyd*, 907 F.2d at 353. *Donnelly*'s standard requires the federal habeas court to ask whether "'the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair.'" *Floyd*, 907 F.2d at 353 (quoting *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986) (citing *Donnelly*, 416 U.S. at 645 and, *inter alia*, *United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981), *cert. denied*, 456 U.S. 989 (1982)); *see also Garofolo*, 804 F.2d at 206 (noting that harmless error doctrine may be applicable to prosecutorial

misconduct involving statements to the jury) (citing *United States v. Hasting*, 461 U.S. 499,

510-12 (1983)). Given the narrow scope of habeas review of prosecutorial misconduct claims, a

habeas petitioner must show "that he suffered actual prejudice because the prosecutor's

comments during summation had a substantial and injurious effect or influence in determining

the jury's verdict." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Bentley v.

Scully*, 41 F.3d 818, 823 (2d Cir. 1994) (internal quotation marks and citation omitted in

original)).

The first instance of alleged misconduct to which Brazeau did not object at trial occurred

when the prosecutor, in her opening statement, "[r]epeatedly and impermissibly bolster[ed] an

identification" of Brazeau by the victim. Pet. at 13 (Dkt. #1) (citing T.233-34, 239). The

prosecutor commented,

> [The victim] didn't make it home at that point, not until later. Because at that
> point the lights go out. He wakes up on the ground with a hole in his chin, tooth
> missing, blood all over his face, his money gone, his wallet gone, and John will
> tell you the only person that was in that alley that had walked next to him that he
> had had a problem with was this big white bald man playing pool as a substitute
> for Wagner's Bar. And you'll hear from the evidence who that person was. That
> person was the defendant. Michael Brazeau.

T.233-34. Reading the remarks in context, it is apparent that the prosecutor was not vouching for

the complainant but simply was informing the jury what she believed that the proof would show.

There was nothing improper about the prosecutor providing fact-based story-telling commentary

during her opening statement with respect to what she expected the witness testimony to be.

The second unpreserved claim of error occurred when the prosecutor allegedly "[m]ade

comments upon matters not in evidence repeatedly, and went beyond the four corners of evidence

during her summation." Pet. at 13 (Dkt. #1) (citing T.779-80). The Court has reviewed the entire

trial transcript, and cannot find any instance of the prosecutor making comments upon matters not in evidence or going "beyond the four corners" of the evidence. This claim is factually baseless and should be dismissed on that basis.

The third unpreserved claim of error occurred when the prosecutor "[i]nappropriately addressed" a sworn juror during her summation and "implied to that juror, that he was robbed like John Barrus, and that according to [petitioner's] theory, that [petitioner] belived [sic] [that the juror] was not normal." Pet. at 13 (Dkt. #1) (citing T.785-86). During her summation, the prosecutor reminded the jurors about how petitioner had posed the question to them during selection, "[I]f you were the victim of a robbery, wouldn't you call the police[?]" T.785. The prosecutor then asked the jurors,

> If you say no, does that mean it didn't happen? The reason he [petitioner] went
> through that exercise is because, I submit, he was hoping you'd all say yes. A
> normal person calls the police, just like he said in his summation, you call the
> police, it means your [sic] normal. If you call the police, it means it happened.
> Well, it did happen. And at least one of you, Mr. Collins, has been robbed like
> John Barrus was robbed, but according to the defense's theory, you weren't
> robbed, you weren't mugged, because you didn't call the police. You're not
> normal because you didn't call the police.

T.785-86. Brazeau argued repeatedly to the jury in his closing statement that it was not "normal" for the victim not to have gone to the police immediately after the incident to report the crime, and that it also was not "normal" for the victim have gone home instead of seeking medical treatment at the hospital. This was fair argument; Brazeau had the right to call attention to the delay in reporting the alleged assault to the police for the favorable inference that a person who is injured in a serious assault would normally immediately report it. Thus, the failure to do so, would inferentially cast doubt on the truthfulness of the victim. Although Brazeau asked

rhetorically if the jurors would not have gone to the police in Barrus' situation, the Court does

not see this as justifying the singling out a juror by name by the prosecutor.  It is an unacceptable

practice for the prosecutor to have singled out one juror by name. While the Court understands

that in the moment, a prosecutor might wish to counter a persuasive argument, this is the type of

comment that has the potential to inflame the jury and cause it to decide the case on emotional,

rather than on a rational basis. Thus, this Court condemns it. Although this comment cannot be

justified by categorizing it as an "invited response," in this Court's view, the prosecutor's

remarks were not necessarily improper as a matter of federal law. *See United States v. Young*,

470 U.S. 1, 11-13, 16 (1985) (explaining the "invited response" rule; where defense counsel

stated that respondent had been "the only one in this whole affair that has acted with honor and

with integrity," he "invited" prosecutor's response, "I don't know whether you call it honor and

integrity, I don't call it that, [defense counsel] does. If you feel you should acquit him for that it's

your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law

that this Judge is going to instruct you, you think that's honor and integrity then stand up here in

Oklahoma courtroom and say that's honor and integrity; I don't believe it"; Supreme Court held

that prosecutor's remarks went "out of bounds" of what was necessary to "right the scale", but

did not rise to the level of plain error; "[v]iewed in context, the prosecutor's statements, although

inappropriate and amounting to error, were not such as to undermine the fundamental fairness of

the trial and contribute to a miscarriage of justice"); *United States v. Rivera*,  971 F.2d 876, 883

(2d Cir. 1992) ("The prosecutor's remarks were legitimate responses to counsel's arguments that

[defendant] had, in essence, been framed by the cooperating witnesses and the government. The

challenged statements were an attempt to focus the jury's attention upon the evidence and away

from defense counsel's claims."). Nevertheless, even if the remark amounted to an error of federal law, the Court views the remark as harmless in light of the overwhelming evidence of Brazeau's guilt, as set forth more fully below.

Finally, the Court turns to the one allegedly improper remark to which Brazeau preserved his claim of error by a timely objection–the statement by the prosecutor that he had lied to witnesses Chuck Calhoun and Joy Vail that "the police had come to his house, that they cleared all of this up," T.780. In the present case, two witnesses–Calhoun and Vail, both of whom were Brazeau's friends–testified that they had questioned Brazeau about the incident at Rascal's Bar involving Barrus and had received assurances from him that the police had cleared him of any involvement in the matter. In light of the evidence presented at trial, that was patently untrue, however.

A prosecutor "should not vouch for his own witness' credibility," *United States v. Sanchez Solis*, 882 F.2d 693, 697 (2d Cir. 1991) (citing) *United States v. Modica*, 663 F.2d 1173, 1178-79 (2d Cir. 1981), *cert. denied*, 456 U.S. 989 (1982)), or "state his personal belief as to the defendant's guilt or innocence," *id.* (citing see *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985). Here, the Appellate Division held in Brazeau's case that, as a matter of New York state law, the prosecutor improperly stated on summation that he had lied to certain witnesses. *People v. Brazeau*, *supra* (citations omitted). The Second Circuit has approved, however, a prosecutor's "limited, non-inflammatory use . . . of terms such as 'lies' to describe testimony that is challenged as untruthful," *id.* (citing *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)). Under these circumstances, Brazeau cannot show that the prosecutor's statement that he "lied" was an improper as a matter of federal law. *See Sanchez Solis*, 882 F.2d at 697 (rejecting

appellant's contention that "prosecutor acted improperly when he suggested that Sanchez had lied on the witness stand" because review of the Government's closing argument "convince[d]" the court "that the prosecutor's comments were not inflammatory"); *United States v. Praetorius*, 622 F.2d 1054, 1060-61 (2d Cir.) ("when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion' ") (quoting *United States v. LaSorsa*, 480 F.2d 522, 526 (2d Cir.), *cert. denied*, 414 U.S. 855 (1973)).

The Court now will review the three challenged remarks under the three factors set forth by the Second Circuit in *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1991), for determining whether a defendant has suffered actual prejudice as a result of a prosecutor's misconduct. Even assuming that any of the remarks to which Brazeau now objects were improper as a matter of federal law, none of them, taken singly or together, was so egregious as to have deprived Brazeau of the right to a fundamentally fair trial. In making the determination of whether a defendant has suffered "actual prejudice" as a result of the prosecutorial misconduct, the Second Circuit has examined "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Tankleff*, 135 F.2d at 252 (quoting *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d at 1181) (internal quotation marks omitted); citing *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)). First, the alleged misconduct at Brazeau's trial cannot be said to have been "severe": The prosecutor's opening statement and summation were otherwise unobjectionable, and thus the three comments challenged here were isolated remarks during a trial conducted in a manner fair to the petitioner. Second, Brazeau did not object to the alleged "vouching" for the victim's

identification during the opening statement or to the instance when the prosecutor addressed one

juror by name.  When a defendant does not object to a prosecutor's remarks, reversal is

warranted only when the misconduct is "flagrant," *United States v. Coriaty*, 300 F.3d 244, 255

(2d Cir. 2002). Such is not the case here. With respect to the comment that Brazeau "lied,"

standby counsel objected and the trial court issued the following curative instruction to the jury:

"The difference in the testimony, the jury will analyze and make that decision as to whether or

not that was part of the testimony." T.780.  Turning to the third *Modica* factor, prejudice, the

Court has reviewed the record in its entirety and there is no reasonable possibility that, "but for"

any of the allegedly improper comments,  Brazeau would have been acquitted. As discussed

elsewhere in this Report and Recommendation, the evidence of Brazeau's guilt was

overwhelming, which compels the conclusion that none of these comments by the prosecutor,

taken singly or together, could have had an injurious effect on the jury's verdict. Brazeau

therefore is unable demonstrate the "actual prejudice" necessary to establish a violation of his

right to a fundamentally fair trial due to any alleged misconduct by the prosecutor. Accordingly,

the Court recommends that habeas relief not issue on this claim.

**Ground Eight:**          **Errors by the trial court deprived petitioner of due process and his right to a fair trial**.

Brazeau contends that the trial court gave an erroneous jury instruction; erroneously

restricted petitioner's Sixth Amendment right to cross-examination; and erroneously responded

to the jury's request for a read-back of testimony, thereby depriving him of his right to due

process and a fair trial. *See* Pet. at 14-15 (Dkt. #1).

The Appellate Division considered the substance of the Sixth Amendment Confrontation

Clause claim and the jury read-back claim and rejected both on the merits. *People v. Brazeau,*

*supra*. Brazeau did not object to the allegedly erroneous jury instruction, and the Appellate

Division held that the claim was unpreserved for review due to the lack of contemporaneous

objection. Respondent argues that the contemporaneous objection rule constituted an "adequate

and independent" state ground for the Appellate Division's decision and bars federal habeas

review of the jury instruction claim. The Court agrees that the Appellate Division's clear and

express reliance upon the contemporaneous objection rule constituted an adequate and

independent basis for its rejection of Brazeau's jury instruction claim, *see Aparicio v. Artuz*, 269

F.3d 78, 90 (2d Cir. 2001); *Franco v. Walsh*, No. 00 CIV. 8930AGSJCF, 2002 WL 596355,

(S.D.N.Y. Apr. 17, 2002). This is so notwithstanding the state court's alternative ruling on the

merits of the claim. *See Glenn v. Bartlett*,  98 F.3d at724 ("'[F]ederal habeas review is foreclosed

when a state court has expressly relied on a procedural default as an independent and adequate

state ground, even where the state court has also ruled in the alternative on the merits of the

federal claim.'") (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) and citing *Harris

v. Reed*, 489 U.S. at 264 n. 10  ("[A] state court need not fear reaching the merits of a federal

claim in an alternative holding."); *Wedra v. Lefevre*, 988 F.2d 334, 338-39 (2d Cir. 1993)). The

Court also recommends dismissing the jury instruction claim on the basis that it is without merit,

as discussed further below.

    As an initial matter, Brazeau has not established that the allegedly objectionable charge

was erroneous as matter of state law. Even if the trial court's instruction did constitute error

under state law, that error, in and of itself, would not be grounds for habeas relief. It is

well-established that a federal habeas court "is limited to deciding whether a conviction violated

the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of

state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *see also* 28 U.S.C. § 2254(a).

Before a federal court may overturn a conviction resulting from a state trial in which an

erroneous instruction was used, or a properly requested instruction was not given, it must be

established not merely that the instruction was erroneous, but that it "violated some right which

was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v Naughten*, 414 U.S.

141, 146 (1975); *accord*, *e.g.*, *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). The Supreme

Court held in *United States v. Frady* that the "degree of prejudice" a petitioner is "required . . . to

show before obtaining unilateral relief for error in the jury charge" is "whether the ailing [jury]

instruction by itself so infected the entire trial that the resulting conviction violates due process,

not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"

456 U.S. 152, 169 (1982) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting

*Cupp*, 414 U.S. at 146, 147) (quotation marks omitted). The Supreme Court reaffirmed in *Frady*

that "'[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will

support a collateral attack on the constitutional validity of a state court's judgment is even greater

than the showing required to establish plain error on direct appeal.'" 456 U.S. at 166 (quoting

*Henderson v. Kibbe*, 431 U.S. at 154) (footnotes omitted); *accord DelValle v. Armstrong*, 306

F.3d 1197, 1200 (2d Cir.2002) ("[T]he [Supreme] Court has held that a state prisoner making a

claim of improper jury instructions faces a substantial burden[.]"). The Supreme Court has

specifically rejected the notion that "an error in the instructions concerning an element of the

crime charged amounts to prejudice *per se*, regardless of the particular circumstances of the

individual case." *United States v. Frady*, 456 U.S. at 169  (reaffirming holding that a petitioner seeking relief on the basis of an erroneous jury charge "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions"). In weighing the prejudice to a defendant from an allegedly improper charge, the challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 147.

> Brazeau ascribes error to the following portion of the trial court's jury charge:

> You will recall that the People and the defendant, I believe, introduced into evidence for your consideration a description of the perpetrator that John Barrus gave to the police several days after the commission of the alleged crime. You may not consider such evidence in deciding whether the right man or wrong man is on trial in this case. *The reason is that such description may match a great many other persons as well as possibly matching defendant and of course the police do not ordinarily submit to the victim for possible identification as the perpetrator or* [sic] *person who does not or to some extent matches* [sic] *that description.*

T.627 (emphasis supplied). As the first part of the charge states, Barrus "provided a description of the perpetrator" several days after the crime. Brazeau asserts that the trial judge's charge did not "make sense in the context of [his] trial" because the court improperly "referred to something about a prior I.D., by stating the police submitted to the victim [sic]," when in fact there had been no pre-trial identification by the victim by a police-arranged procedure. Pet. at 14 (Dkt. #1). However, after reading the entire instruction in context, the Court agrees with the Appellate Division held that the "charge as a whole adequately conveyed the appropriate standards to the jury[.]" *People v. Brazeau*, *supra*. Even if the challenged portion of the charge were ambiguous, the Court does not see how Brazeau sustained "actual prejudice" as a result of this language,

especially since Brazeau argued to the jury during his summation that the victim's identification

of him at trial was suspect since the police never had him identify the perpetrator at a pre-trial

line-up.  Brazeau has not demonstrated that there was any error of state law in the challenged

portion of the charge, let alone any error of federal constitutional dimension. The Court

accordingly recommends that this claim of trial court error be dismissed.

Brazeau's second claim of error by the trial court occurred when the judge improperly

"restricted [petitioner']s cross-examination of Detective Booze[,]" Pet. at 14 (Dkt. #1) (citing

T.509-11), in violation of his rights under the Sixth Amendment's Confrontation Clause.  The

| | | |
|---|---|---|
| Q: | Okay, and does he [the victim] say that Michael Brazeau assaulted him? | |
| A: | He does not say that in his statement. | |
| Q: | Does he say that Michael Brazeau robbed him? | |
| A: | He does not say that in his statement. | |
| Q: | He leaves that to you to interpret that's what occurred, didn't he? | |
| A: | Yes. | |
| Q: | So it's up to you to determine if he was robbed or assaulted because he never says he was robbed or assaulted, is that true? | |
| A: | Well, his money is missing and he didn't give it away, and you were seen with him, so it makes me think, yeah, I could deduce based on that that you were certainly there when whatever happened, and in my opinion it was assault and robbery. | |
| | The Court: | Okay, we're going a little bit too far. We'll just terminate this conversation. She's giving her opinion now, the question of fact is for the jury to decide, not for her, that's the ultimate issue here in this trial. |
| | The Defendant: | Right. |
| | The Court: | We're not going to let a witness give her opinion as to what happened. |
| | The Defendant: | Well, I'm trying to establish that she didn't even have probable cause to arrest me based on what she was told. |
| | The Court: | That's irrelevant. |
| | The Defendant: | I'm [sic] saying I can't say there wasn't even enough to arrest me on the allegation? |
| | The Prosecutor: | Judge, I object, as there's been a ruling on probable |

|                 |                                                                                                                                                                                                   |
|-----------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                 | cause.                                                                                                                                                                                             |
| The Defendant:  | Well, I can always re –                                                                                                                                                                            |
| The Court:      | Those are legal arguments that are not questions for the jury. The jury doesn't have to find probable cause, they have to find proof beyond a reasonable doubt that you in fact did commit the crime. |
| The Defendant:  | Right, but if I can prove that the officer didn't even have –                                                                                                                                      |
| The Court:      | That's a legal issue, it's been decided. You can't question the witness about it. I'm sorry, that's it.                                                                                            |

T.509-11.

The Confrontation Clause of the Sixth Amendment secures for a criminal defendant the

right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (citing *Douglas v.

Alabama*, 380 U.S. 415, 418 (1965). This means an "'*opportunity* for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish.'" *Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir. 1991) (quoting

*Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original) and citing *United States v.

Owens*, 484 U.S. 554, 559 (1988); *Harper v. Kelly*, 916 F.2d 54, 57 (2d Cir.1990) ("[R]ulings

that improperly restrict cross-examination under state or federal rules of evidence do not

necessarily implicate the Confrontation Clause. Rather, the Constitution only guarantees an

opportunity  for effective cross-examination, not cross-examination that is effective, in whatever

way, and to whatever extent, the defense might wish.") (internal quotation marks omitted)). The

trial judge retains "wide latitude" to reasonably limit a defendant's cross-examination of

witnesses based on concerns about repetitious or only marginally relevant  interrogation, for

example. *Delaware v. Van Arsdall*, 475 U.S. at 679; *accord United States v. Flaharty*, 295 F.3d

182, 190-91 (2d Cir. 2002).

Here, there was no error on the part of the trial court in its handling of Brazeau's cross-examination of Detective Booze. To the contrary, Brazeau's improper questioning of Detective Booze allowed her to give her opinion–before she was cut-off by the trial judge–about ultimate factual issues that properly were for the jury to decide–namely, whether a robbery and assault had been committed. As the Appellate Division held, the trial court was correct in limiting Brazeau's cross-examination to prevent this from occurring any further. In fact, the trial court's curtailment of the cross-examination of Detective Booze was an attempt to protect petitioner's interests and his right to a fair trial. Brazeau, of course, would not agree, but the foregoing line of questioning was drawing out testimony that was not helpful to the defense. As the Second Circuit has noted, "restrictions on a defendant's presentation of evidence are constitutional if they serve 'legitimate interests in the criminal trial process,' . . . and are 'not arbitrary or disproportionate to the purposes they are designed to serve.'" *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992). To the extent that Brazeau was attempting to elicit testimony from Detective Booze on cross-examination regarding her opinion about whether there was probable cause to arrest him, that issue was wholly irrelevant to the questions to be decided by the jury at trial, and the trial judge was well within his discretion in curtailing petitioner's questioning of her. *See Delaware v. Van Arsdall*, 475 U.S. at 679; *see also United States v. Salameh*, 152 F.3d 88, 131 (2d Cir. 1998); *United States v. Scotti*, 47 F.3d 1237, 1248 (2d Cir.1995). Brazeau has therefore failed to demonstrate a violation of his Sixth Amendment Confrontation Clause rights based on the trial court's curtailment of his cross-examination of Detective Booze.

Brazeau's third claim of error by the trial court occurred when the judge erroneously responded to a request by the jury for "testimony of John [Barrus] specifically where John stated

Mike [Brazeau] asked him for a beer at his home, also testimony of Joy [Vail] slash or dash Mike [sic] discussing with [sic] somebody at Wagner's owed him money." T.863-72. The first part of the requested testimony was located quickly, but there was an issue finding testimony responsive to the second part of the request:

| | |
|---|---|
| The Court: | We have the first part of the testimony discovered. The second request, [the court reporter]'s been through Joyce [sic] [Vail]'s testimony, and there is no discussion in her testimony, however there is some testimony in Chuck [Calhoun]'s testimony. |
| A Juror: | Okay. |
| A Juror: | That's the one we want. |
| A Juror: | Yeah. |
| A Juror: | We weren't sure which witness it was. |

T.863-64. Brazeau contends that the trial judge erred because he "continued on talking to the jury with the ADA, and then . . . stand-by counsel objected and [petitioner] raised concerns too." According to Brazeau, this caused the jury to become "confused and at odds with each other about the request" which ultimately denied him a "fair trial and due process of law[.]" Pet. at 15 (Dkt #1). The colloquy about which Brazeau is complaining actually dealt with the first part of the jury's request regarding testimony about the victim being asked by petitioner to have a beer. Brazeau's contentions are not supported by the record, which indicates that contrary to "confusing" the issue, the court's colloquy with the jury eventually established, with specificity, which portion of the victim's testimony the jury was requesting. Also contrary to his contention, neither Brazeau nor standby counsel objected at the time.

On direct appeal, the Appellate Division held that the trial judge gave a "meaningful response" to the jury's request for a read back of testimony and did not abuse its discretion in evaluating the jury's request and framing the response. *People v. Brazeau*, *supra*. New York law

provides that when the jury requests further instructions or information during its deliberations,

the court must "give such requested information or instruction as [it] deems proper[.]" N.Y.

Crim. Proc. Law § 310.30. The New York Court of Appeals explained that although the trial

court "possesses some discretion" under C.P.L. § 310.30 in framing its responses to jury

inquiries, "it must respond meaningfully . . . ." *People v. Almodovar*, 62 N.Y.2d 126, 131-132

(N.Y. 1984) ("[T]he sufficiency of a trial court's response is gauged by "the form of the jury's

question, which may have to be clarified before it can be answered, the particular issue of  which

inquiry is made, the supplemental instruction actually given and the presence or absence of

prejudice to the defendant[.]") (quotation omitted). The Court notes that the Appellate Division

decided petitioner's claim in terms of C.P.L. § 310.30, a state statutory requirement. Thus, to the

extent that Brazeau contends that his rights under New York state law were violated by the trial

court's response to the jury's request for a read-back of testimony, he fails to state a federal

constitutional claim cognizable on habeas review. *See Estelle v. McGuire*, *supra*; 28 U.S.C. §

2254(a); *Smith v. Keane*, Nos. 98-CV-5615 (JBW), 03-MISC-0066 (JBW), 2003 WL 21850566,

at *5 (E.D.N.Y. July 30, 2003) (holding that petitioner's claim that trial judge erred in

interpreting jury note as requesting read-back of officers' testimony raised only state law issues,

and thus was not cognizable in federal habeas corpus proceeding). In any event, Brazeau has not

demonstrated that there was any error of state law in the trial court's response to the jury's

request. Lacking from his argument is any allegation of how he actually was prejudiced by the

response–which he must demonstrate in order to show that the response was not "meaningful,"

and therefore outside the bounds of its discretion.

The Second Circuit has held that as a matter of federal law, "[w]hether to allow testimony

to be reread to the jury is a matter committed to the sound discretion of the trial court[.]" *United States v. Elroy*, 910 F.2d 1016, 1026 (2d Cir. 1990) (citing *United States v. Parker*, 903 F.2d 91, 102 (2d Cir.1990); *United States v. Damsky*, 740 F.2d 134, 138 (2d Cir.), *cert. denied*, 469 U.S. 918 (1984)). Proper factors to be taken into account by the trial court in formulating its discretionary response are whether reading certain testimony back will call undue attention to it, whether giving the readback will unduly delay the proceeding, and the difficulty involved in reading back the requested testimony. *Damsky*, 740 F.2d at 138 (quotations omitted); *accord*, *e.g.*, *United States v. Escotto*, 121 F.3d 81, 84 (2d Cir. 1997).

In order to demonstrate that there was any error of federal law, Brazeau must show that the trial court acted outside the bounds of its discretion, which is a more onerous standard than that under New York state law. *Compare People v. Malloy*, 55 N.Y.2d 296, 302 (N.Y. 1982), *with United States v. Price*, 447 F.2d 23, 31 (2d Cir. 1971) (holding that where the jury requested to see the entire testimony of a witness but the transcript was only partially completed, the trial court did not abuse its discretion in refusing to "read all 94 pages of testimony to the jury" because it "would [have] give[n] a lopsided view"; stating that "[s]uch determinations are committed to the sound discretion of the trial judge"); *United States v. Ratcliffe*, 550 F.2d 431, 434 (9th Cir. 1976) (*per curiam*) (holding that where the trial court refused to allow any readbacks in order to induce jurors to pay attention there was no abuse of discretion) (cited in *Damsky*, 740 F.2d at 138)). Brazeau has not shown any abuse of discretion by the trial judge. Nothing in the record indicates that the jurors were not satisfied with the trial court's interpretation of their request or its response to them. Moreover, Brazeau has not shown, nor can he, on the facts here, how he was prejudiced by the trial court's read-back. Having failed to demonstrate that the trial

court's response to the jury's request for a read-back of testimony violated any state law, let alone amounted to an error of constitutional magnitude sufficient to deny him of his right to a fundamentally fair trial, Brazeau should not obtain relief on this claim. The Court recommends that it be dismissed.

For all of the foregoing reasons, the Court recommends that all of Brazeau's claims of trial court error set forth under Ground Eight be dismissed.

**Ground Nine:**     **The prosecution violated its disclosure obligations under *Brady v. Maryland*.**

Brazeau contends that the prosecutor failed to disclose certain items of allegedly favorable evidence, in violation of the prosecutor's duties under *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, Brazeau identifies the following items of allegedly suppressed *Brady* material: the grand jury testimony of John Barrus, the victim; the grand jury testimony of witnesses Fred and Ann Grace; the victim's full criminal record; and whether "the witness received any favorable treatment in exchange for his testimony." Pet. at 16 (Dkt. #1). On direct appeal, the Appellate Division "conclude[d] that defendant was not denied a fair trial by a delay in disclosing alleged *Brady* material inasmuch as defendant received a meaningful opportunity to use that material at trial[.]" *People v. Brazeau*, 304 A.D.2d at 257 (citations omitted).

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *accord*, *e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280 (1999). In order for there to be a true *Brady* violation, the court must make a finding of "materiality" with respect

to the suppressed evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *accord, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. at 682; *accord Strickler v. Greene*, 527 U.S. at 280. Stated another away, a "'reasonable probability' of a different result is shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *accord, e.g., United States v. Madori*, 419 F.3d 159, (2d Cir. 2005)

*Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial. Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998). Thus, the prosecutor's duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *Bagley*, 473 U.S. at 676; *accord Strickler*, 527 U.S. at 280. Impeachment evidence "is 'evidence favorable to an accused,' *Brady*, 373 U.S. at 87, such that, if disclosed and used effectively, it may make the difference between conviction and acquittal," *id.*

The Court turns the first item of alleged *Brady* material, the grand jury minutes of the victim, John Barrus and bar owners Fred and Ann Grace. At the March 14, 2001 sentencing hearing, Brazeau raised the *Brady* issue, and the trial court heard argument on it. The prosecutor stated that she provided the grand jury testimony of the victim prior to his trial testimony, which,

under New York law, was "the appropriate time in which to provide it to defense counsel." S.39.

Brazeau did not contest that statement at the hearing, and he concedes in his petition that on the

third day of trial, the prosecution turned over copies of the grand jury testimony of Barrus, the

victim; and of witnesses Fred and Ann Grace. Pet. at 16 (Dkt. #1). The third day of Brazeau's

trial was October 5, 2000, and Barrus was re-called on that day for further examination by

Brazeau. At the sentencing hearing, Brazeau asserted that he was prejudiced by the timing of the

disclosure because he "couldn't prepare anything on the issue of identification because no one

identifie[d] [him] by name or person." S.36. There is nothing to counter the Appellate Division's

finding that Brazeau received the victim's grand jury minutes in time to make effective use of

them at trial.  Brazeau repeatedly questioned the witnesses on the issue of identification, so he

was not hindered in attempting to make this point by allegedly not having the grand jury minutes

prior to the commencement of trial. Moreover, neither the Second Circuit nor the Supreme Court

has specified the timing of disclosure that *Brady* requires, but it is clearly established that

"disclosure prior to trial is not mandated." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir.2001)

("It is not feasible or desirable to specify the extent or timing of disclosure Brady and its progeny

require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity

to use the evidence when disclosure is made.") (citations omitted). All that is required by

Supreme Court and Second Circuit precedent is that *Brady* material be disclosed "in time for its

effective use at trial." *United States v. Gil*, 297 F.3d 93, 105 (quoting *United States v. Coppa*,

267 F.3d 132, 142 (2d Cir. 2001)). Here, the trial transcript reveals that Brazeau was provided

with the grand jury minutes in time to make "effective use" of them during his cross-examination

of the victim, John Barrus, and witnesses Fred and Ann Grace.  Accordingly, Brazeau has failed

to demonstrate the prosecutor "suppressed" the victim's grand jury minutes within the meaning of *Brady v. Maryland*, 373 U.S. 83, *supra*.

Moreover, Brazeau has failed to demonstrate how the grand jury minutes were favorable to him. He contends that Barrus did not "identify him" in the grand jury minutes because he did not "mention [his] name" or "claim to know [him] personally." Pet. at 16 (Dkt. #1). At the sentencing hearing, the trial court rejected Brazeau's argument that the grand jury minutes were exculpatory since Brazeau was "identified sufficiently in the Grand Jury[,]" the "same way [he] [was] identified at the trial." S.37. This Court is mystified by the implication in Brazeau's argument that the victim of a crime must know the name of his attacker, much less know him on a personal basis, in order to be a credible complainant. As discussed above, identity is an element of a crime that may be proven solely by circumstantial evidence. Finally, Brazeau has not demonstrated how having victim's grand jury minutes would have had any conceivable effect on the jury's verdict since the victim admitted on direct examination that he had never seen Brazeau before the night of the incident and did not learn his name until afterwards. Furthermore, Brazeau cross-examined the victim at length and Barrus admitted that Brazeau was a "stranger" to him on the night of the incident. T.365.  The grand jury minutes would not have added anything to Brazeau's ability to cross-examine the victim.

With regard to the grand jury minutes of Ann and Fred Grace, Brazeau does not address specifically how they were exculpatory but makes a general statement with regard to Barrus and the Graces that "[n]o where [sic] in any of their testimony before the grand jury did they identify [him]self to the grand jury, nor mention [his] name or claim to know [him] personally, or did they give testimony that they witnessed a crime, or a crime committed by [him]." Pet. at 16 (Dkt.

#1).  However, Brazeau cannot seriously dispute that the Graces knew him personally; indeed, it was apparent at trial the Graces and Brazeau knew each other well enough for them to address each other by first name. Although the Graces did not witness the assault and robbery, that fact did not make their testimony exculpatory. To the contrary, both Fred and Ann Grace corroborated the victim's testimony about how he had to leave the bar because he was being hassled by Brazeau, and Ann Grace testified that Brazeau left the bar moments thereafter, headed in the same direction as the victim. Thus, the Graces provided testimony helpful to the prosecution's case against Brazeau.

The Court turns next to the allegedly withheld items concerning the victim's criminal history–namely, the victim's probation report and "rap sheet". *See* Pet. at 16 (Dkt. #1); *see also* S.32-33.  As to the probation report, the prosecutor indicated at the sentencing hearing that "the People aren't even entitled to them, let alone the defendant[.]" S.40. There is no indication whatsoever that this statement was not true. If the prosecution did not actually or constructively possess the information at issue, it cannot have "suppressed" it. The Court cannot find, therefore, that the victim's probation report constituted *Brady* evidence that was withheld by the prosecution.

With respect to the victim's rap sheet, Brazeau conceded at the sentencing hearing that he received it, but complained that it was not "until the day of the trial." S.32. As noted above, there is no requirement under Supreme Court or Second Circuit precedent that disclosure of *Brady* material occur prior to the commencement of trial. *See*, *e.g.*, *Leka v. Portuondo*, 257 F.3d at 100. Brazeau received the victim's criminal record in time for him to make "effective use" of it during his cross-examination of that witness. To the extent that Brazeau alleged that the prosecutor

failed to run a "multi-state" search regarding the victim's criminal history, that contention was addressed and disposed of by the prosecutor at the oral argument on the *Brady* issue. *See* S.39-40.

The Court turns next to the contention that the prosecution withheld information concerning the victim's alleged mental health issues that amounted to material impeachment evidence. Brazeau contends that "the Sheriff's Department computer show[ed]" that the victim was a "suicide risk, so he's been on some psychotic [sic] medication which he denied on the stand." S.35; *see also* Pet. at 16 (Dkt. #1).  Brazeau contended that "the jail records would [have] show[ed] he was a suicide risk." S.35. As discussed above, the prosecutor performed a "multi-state" search of the victim's criminal history and "turned over what she had" to Brazeau. *See* S.35, 39-40. Apart from stating that he "personally viewed . . . on the Sheriff's Jail computor [sic]," that the victim was listed as a "suicide risk" being prescribed "psychotic [sic] medications," Brazeau has not substantiated his allegation that such information even exists, much less that it was in the actual or constructive possession of the district attorney's office.

Assuming for the sake of argument (1) the truth of Brazeau's allegations about the victim's mental health; (2) the prosecution's constructive knowledge thereof ; and (3) that this information was favorable impeachment information, Brazeau's claim still fails because the evidence does not meet the third, materiality prong necessary to prove a *Brady* violation. Undisclosed exculpatory or impeachment evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 434. The "reasonable probability" requirement is satisfied when it is shown that the suppression of evidence "undermines confidence in the

-55-

outcome of the trial." *Id.* at 435 (quotations and citation omitted). It is not possible to find that

the information about the victim's alleged mental health status was material to the verdict under

any view of the evidence presented at Brazeau's trial. *See Chandras v. McGinnis*,  No. 01 Civ.

2519(LBS), 2002 WL 31946711, *10 (E.D.N.Y. Nov. 13, 2002) ("Evidence of [chief prosecution

witness] Callahan's psychiatric history does not satisfy th[e] [*Brady*] materiality standard.

Although Callahan testified to hearing voices, there is no indication that Callahan's mental

illness impaired his ability to perceive or recount events either on the date of the robbery or

during trial."). Even if Brazeau could have established that the victim was a "suicide risk" taking

"psychotic [sic] medication," that does not necessarily mean that he was incapable of accurately

and truthfully perceiving and recalling events. Indeed, there was no indication at trial that the

victim's  ability to observe or recount events on the date of the robbery and assault or at trial was

impaired by medication, alcohol, or any other controlled substance. Barrus testified that he had

one or two beers, and bar owner Ann Grace testified that he "wasn't drinking that much."  There

was no testimony that Barrus demonstrated any signs of being intoxicated. (Brazeau, by contrast,

admitted on cross-examination to consuming approximately ten (10) beers during the course of

the evening before leaving the bar shortly after the victim did).

The final item of alleged *Brady* material pertains to information that the victim

supposedly was given favorable treatment in connection with a pending criminal charge in

exchange for his testimony against Brazeau.  Brazeau asserts that on January 31, 2001, the victim

"was allowed to plead down to a misdemeanor DWI, for this 5th DWI conviction[.]" Pet. at 16

(Dkt. #1); *see also* S.34. He claims that he gathered this information "out of a local newspaper"

and that he was denied "requests for information of any rewards, favorable treatment given,

planned or contemplated by the people." *See id.* At Brazeau's sentencing hearing, the prosecutor

indicated that she was "not involved in the prosecution of" Barrus on the DWI charge. S.40.

When she saw Barrus' name on a court calendar, she spoke to the assistant district attorney

handling the case, informed him that Barrus was a victim of an assault and robbery providing

testimony in a case she was handling but "specifically indicated that [she] wished no favorable

treatment for Mr. Barrus as a result of his participation in this case." S.41.  The Court notes that

Brazeau's trial took place in early October 2000; Barrus' plea to the DWI was not until January

of 2001.

The Court observes that, after filing his habeas petition, Brazeau submitted some further

documentation regarding the disposition of Barrus' DWI charge; the information is attached to  a

document dated October 12, 2004. *See* Dkt. #8. This document (Dkt. #8) was docketed as a letter

to the court. In it Brazeau states simply, "Please also be advised that I have newly discovered

evidence and plan to move the trial court by way of a C.P.L. § 440.10 motion[,]" *see id.* at 1

(Dkt. #8).  Attached to the letter are a "Notice of Motion to Vacate Judgment/Conviction Under

Criminal Procedure Law § 440.10(1), (b), (c), (f), and (h), or in the alternative grant post-

judgment discovery and an evidentiary hearing pursuant to C.P.L. § 440.30(5)", along with

Exhibits A through E. Brazeau has captioned the notice of motion in New York State Supreme

Court (Niagara County) but he has not signed or dated it, and there is no indication that it

actually was filed. Furthermore, in the nearly three years since he filed Dkt. #8, Brazeau has filed

nothing further in this Court regarding the matter.

In any event, Exhibit D is the transcript of the March 27, 2001 hearing regarding Barrus'

sentencing on his guilty plea in January 2001 to the DWI, a class A misdemeanor. *See* 3/27/2001

Transcript of John Barrus' Sentencing ("Barrus Tr.") at 2, attached as Ex. D to Dkt. #8. In his

proposed C.P.L. § 440.10 motion (Dkt. #8), Brazeau claims that this constitutes *Brady* material.

The Court assumes that Brazeau intends this sentencing transcript to be considered as part of the

evidence supporting his *Brady* claim raised in his habeas petition. The Court has reviewed the

Barrus transcript in its entirety, along with the rest of the exhibits attached to Dkt. #8. None of

them support Brazeau's claim that he was denied his due process rights as a result of a failure to

disclose *Brady* material. In fact, the prosecutor from Brazeau's trial, Ms. Juliao, appeared at

Barrus' sentencing and confirmed the statements she made at Brazeau's March 14, 2001

sentencing, as detailed above.

At Barrus' sentencing, the trial court asked, "[h]ow did this go from a felony to a

misdemeanor plea?" Barrus Tr. at 6 (Dkt. #8). Barrus' defense counsel replied, "Primarily

because of John's participation as a witness in the other case[.]" *Id.* (Dkt. #8). The prosecutor in

Barrus' case, Ms. Young, clarified that the plea offered to Barrus, however, had "not [been]

conditioned upon Mr. Barrus' cooperation[,]" *id.*  The assistant district attorney who prosecuted

Brazeau's case, Ms. Juliao, was at Barrus' sentencing as well, and confirmed that in the

following colloquy:

> Ms. Juliao:     At no time did he seek any favoritism or reduction in his plea. In
> fact, the only mention he made . . . about his case pending was
> about knowing where the courthouse was. It was only after the
> actual trial and conviction that I became aware of Mr. Barrus' case.
> Basically I was in court one day when he happened to have had a
> court appearance. I spoke to Mr. Brenner about the case. I indicated
> to him that Mr. Barrus did not cooperate as part of the trial as a
> condition of any promise of disposition and, in fact, I wasn't
> recommending any specific disposition at all on behalf of Mr.
> Barrus.
> I think his participation in the trial was because, in fact, he was the

|  | victim, came forward and did the right thing. . . . Those favorable issues [Barrus' status as a veteran; his work history, and his family support] that Mr. Heim [Barrus' defense counsel] has raised here, I think those things were taken into consideration by Mr. Brenner after [Brazeau's] trial when he became familiar with Mr. Barrus' history.<br>I wanted to make it clear that this is not a situation where there was a bargain and plea requiring cooperation. |
|---|---|
| Mr. Heim: | That's correct. My information is that the Brazeau matter was completely resolved and finished before discussion about the plea in this particular case. |

Barrus Tr. at 7-8, Ex. D to Dkt. #8. The state court then proceeded to sentence Barrus to three

years probation, including revocation of his driver's license for those three years, six months

participation in a work release program, attendance of at least four Alcoholics Anonymous

meetings per week, and submission to random drug testing five times per year. Barrus Tr. at 10-

11.

It appears that Brazeau is contending that the Barrus transcript establishes favorable

treatment by the prosecutor toward Barrus based on Mr. Heim's statement at the beginning of the

hearing concerning the reduction in the plea from a felony to a misdemeanor. This was

contradicted by both assistant district attorneys, Ms. Young and Ms. Juliao, and later by Barrus'

attorney himself. *See* Barrus Tr. at 7-8. Even assuming, however, that Brazeau has substantiated

his claim that Barrus received "favorable treatment" with respect to his DWI charge, the Second

Circuit specifically has held that "the fact that a prosecutor afforded favorable treatment to a

government witness, standing alone, does not establish the existence of an underlying promise of

leniency in exchange for testimony." *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003).

Assuming that the Barrus transcript constitutes *Brady* material, Brazeau apparently already knew,

at the time of trial in October 2000, that Barrus had a pending DWI charge; the victim admitted

to this on direct examination and also admitted that he had a DWI conviction, *see* T.351. Brazeau was aware of that fact but chose not to cross-examine the victim at the time about it. Most important, Brazeau cannot demonstrate how he was prejudiced, because there is a reasonable probability that the outcome of the trial would have been different had Brazeau had this information regarding the disposition of the victim's pending DWI charge.

As a final observation, the Court notes that Barrus was the victim of the crime here, not a "reluctant witness" who needed any inducements to provide testimony at Brazeau's trial. Although Barrus did not go immediately to the police after the incident, he nevertheless actively pursued the matter by taking steps on his own to find out who the perpetrator was. As soon as he had determined that Brazeau was the name of the "big, bald, white guy" playing pool for Wagner's Bar who had been harassing him on the night of the incident, Barrus went to the police that same day–March 8, 2000, only three days after the incident–and filed an incident report. *See* T.385-86. As the trial court noted, the prosecution "had no need to offer him anything to get him to testify here in this case in the first place." S.41-42.

For all of the foregoing reasons, the Court recommends that habeas relief be denied with respect to all of petitioner's *Brady* claims.

**Ground Ten:**  **The trial court erroneously denied petitioner's motion to preclude the victim from identifying petitioner at trial.**

As his tenth ground for relief, Brazeau contends that the trial court erred in denying his July 22, 2000 motion "to preclude Barrus from testifying at trial and "from attempting any identification of [petitioner] at trial because his impartial judgement ha[d] been corrupted" by the prosecutor's having told Barrus that Brazeau was in jail. Pet. at 17 (Dkt. #1). Brazeau also

contends that the trial court "committed an error in refusing to conduct a hearing on" his motion

to preclude Barrus' identification testimony. *Id.* (Dkt. #1). On direct appeal, the Appellate

Division held that "the court did not err . . . in permitting the victim to identify him at trial"

because "[i]n cases where there has been no pretrial identification procedure and the defendant is

identified in court for the first time, the defendant is not deprived of a fair trial because

[defendant] is able to explore weaknesses and suggestiveness of the identification in front of the

jury[.]" *People v. Brazeau*, *supra* (citing, *inter alia*, *People v. Medina*, 208 A.D.2d 771, 772)

(citing *People v. Bradley*, 154 A.D.2d 609, 610 (App. Div. 2d Dept. 1989) ("[W]e find that the

in-court identification complained of was not unduly suggestive. As a general rule, a criminal

defendant does not have a constitutional right to participate in a lineup[.]") (citing *United States*

*v. Williams*, 436 F.2d 1166, 1168-69 (2d Cir. 1971), *cert. denied*, 402 U.S. 912)).

      As an initial matter, the Court notes that the victim did not make a pre-trial identification

of petitioner pursuant to a police-arranged procedure. Brazeau has cited no caselaw, federal or

state, for the proposition he urges–that the identifying witness, who did not make a pre-trial

identification, is precluded as a matter of law from identifying the defendant at trial merely

because the defendant alleges that the victim was "impartial."  Even a pre-trial identification

made pursuant to an "unduly suggestive" procedure, will not be excluded as a matter of law

absent a showing that the identification is itself unreliable. *See Manson v. Brathwaite*, 432 U.S.

98, 115-16 (1977) (holding that although the identification procedure was suggestive since only

one was used, and unnecessary since there was no emergency or exigent circumstance, there did

not, under the totality of the circumstances, exist a substantial likelihood of irreparable

misidentification, where the identification was made by a trained police officer who had a

sufficient opportunity to view the suspect, accurately described him, positively identified his

photograph, and made the photograph identification only two days after the crime).

Furthermore, Brazeau was not entitled as a matter of federal constitutional law to a pre-

trial hearing regarding the admissibility of the victim's identification testimony. *See, e.g.*,

*Watkins v. Sowders*, 449 U.S. 341, 349 (1981). Even where there is a contention that the witness'

pre-trial identification of defendant was the result of impermissibly suggestive police procedures,

the Supreme Court has made it clear that although "[a] judicial determination outside the

presence of the jury of the admissibility of identification evidence may often be advisable[,]" the

Constitution does not "require[ ] a *per se* rule compelling such a procedure in every case." *Id.*;

*accord  Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998) (citing *Watkins*, 449 U.S. at 349

and *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1983) ("No *per se* rule requires such a

hearing . . . ."), *modified on other grounds*, 756 F.2d 223 (2d Cir. 1984); *Brown v. Harris*, 666

F.2d 782, 785 (2d Cir. 1981), *cert. denied*, 456 U.S. 948 (1982)). Although "identification

testimony is significant evidence, such testimony is still only evidence[.]" *Id.* at 348, and the

information needed for assessing the reliability of identification testimony ordinarily can be

elicited at trial through "the time-honored process of cross-examination," *id.* at 349; *see also id.*

at 348 ("Counsel can both cross-examine the identification witnesses and argue in summation as

to factors causing doubts as to the accuracy of the identification-including reference to both any

suggestibility in the identification procedure and any countervailing testimony such as alibi.")

(quoting  *Manson v. Brathwaite*, 432 U.S. at 114, n. 14) (quoting *Clemons v. United States*, 133

U.S. App. D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (concurring opinion) (footnote omitted in

original)).

*Watkins v. Sowders*, 449 U.S. at 349, clearly holds that the Due Process Clause of the

Fourteenth Amendment does not require a determination of the admissibility of identification

testimony outside the presence of the jury. Brazeau was not entitled, as a matter of federal

constitutional law, to a pre-trial hearing on his motion to preclude the victim from providing

identification testimony at trial. The Court recommends that this claim be dismissed.

> **Ground Eleven:**     **The prosecutor improperly cross-examined petitioner regarding his use of aliases in violation of the trial court's *Sandoval* ruling; and**
>
> **Ground Twelve:**     **Petitioner was denied his rights to due process and equal protection of the laws because the Appellate Division, Fourth Department, failed to properly apply and follow New York state law concerning the admission of evidence concerning a defendant's use of aliases.**

Because Brazeau's eleventh and twelfth grounds for relief are closely related, the Court

will address them together. Brazeau contends that the trial court "contradict[ed] its own *Sandoval*

Ruling in the midst of [his] trial testimony by holding that the People could cross-examine [him]

as to twenty-six prior instances of using false names." Pet. at 18 (Dkt. #1). Brazeau also argues,

as twelfth ground for relief, that he was denied his constitutional rights due to the Appellate

Division's erroneous application of the New York State Court of Appeals decisions regarding the

admissibility of evidenced concerning a defendant's aliases "in *People v. Walker*, 83 N.Y.2d 455

(N.Y. 1994) and *People v. Williams*, 56 N.Y.2d 236 (N.Y. 1982), as well as the collateral impact

the opinion at issue will necessarily have on the precedent and procedures developed and

mandated by *People v. Schwarzman*, 24 N.Y.2d 241, *People v. Sandoval*, 34 N.Y.2d 371, and the

vast body of case law interpreting those seminal cases." Pet. at 20; *see also id.* at 20-23 (Dkt. #1).

Brazeau asserts that if he had known the alias evidence would have been introduced during his

cross-examination, he "would not have testified." Pet. at 21 (Dkt. #1). Brazeau argues that the

Fourth Department erroneously interpreted and misapplied *People v. Walker* because it held "that

a trial court was not obligated to conduct a *Sandoval*-like weighing of the alias evidence offered

to impeach [a defendant's] credibility, and to render a decision before [he] was subject to cross-

examination," thereby "implicitly conclud[ing] that the trial court's failure to recognize it's [sic]

obligation was not an abuse of discretion[,]" contrary to *People v. Williams*. Pet. at 23 (Dkt. #1).

The Supreme Court has "stated many times that 'federal habeas corpus relief does not lie

for errors of state law.'" *Estelle v. McGuire*,  502 U.S. at 68 (quoting *Lewis v. Jeffers*, 497 U.S. at

780 and citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ

on the basis of a perceived error of state law.")). It is not the province of a federal court, sitting in

habeas review, to reexamine state-court determinations on state-law questions. *Id.* Rather, a

habeas court is "limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States." *Id.* (citing, *inter alia*, *Rose v. Hodges*, 423 U.S. 19, 21 (1975) ("A

necessary predicate for the granting of federal habeas relief to respondents is a determination by

the federal court that their custody violates the Constitution, laws, or treaties of the United

States[.]") (*per curiam*) (citations omitted)); *see also* 28 U.S.C. § 2254(a).

The purpose of a hearing pursuant to *People v. Sandoval* is to determine the extent to

which a defendant may be cross-examined concerning past crimes and misconduct. At the

*Sandoval* hearing, the prosecutor only addressed Brazeau's previous criminal convictions; the

trial court ruled that the prosecutor could ask Brazeau if he had been convicted of "at least one

felony" but was not permitted to question him about the underlying facts. During cross-

examination, the prosecutor began to cross-examine him about his name; Brazeau's standby

counsel objected on the basis that the use of alias evidence had not been discussed during the limited *Sandoval* hearing held in chambers. T.709-19. Counsel for Brazeau also contended that he had been deprived of the right to make an informed decision about whether to testify because he did not know that the prosecutor was going to seek to bring the alias evidence. *See id.* Citing *People v. Walker*, 83 N.Y.2d 455, the trial court held that a pre-trial determination on the admissibility of such evidence was not mandatory and allowed the prosecutor to ask Brazeau two questions–whether he had ever used a false name and, if so, how many times. The prosecutor then questioned Brazeau in accordance with the trial court's ruling, eliciting testimony that Brazeau had used an alias on twenty-six occasions in the past. A review of the trial record makes clear that the judge in Brazeau's case did not "contradict" his *Sandoval* ruling because the issue of alias evidence was never addressed or ruled on. The Court appreciates that Brazeau would have preferred litigating the admissibility of his use of aliases prior to the commencement of his testimony. However, neither New York state law nor federal law requires that the issue be addressed prior to the testifying defendant taking the stand, as discussed below.

Brazeau has not demonstrated that the state courts in his case misapplied *People v. Walker*, *supra*; *People v. Williams*, *supra*, or any of the other New York state cases cited in his habeas petition regarding the admissibility of a defendant's use of aliases as impeachment material. Brazeau concedes, as he must, that the New York Court of Appeals clearly held in *People v. Walker* that evidence as to a defendant's aliases is "proper impeachment evidence because it 'goes to the very heart of the question of that individual's testimonial credibility.'" Pet. at 22 (Dkt. #1) (citation  omitted in original). Brazeau contends, however, that alias evidence "require[es] <u>advance</u> consideration and ruling by the trial court . . . before the defendant must

determine whether to exercise his constitutional right to testify." Pet. at 22 (Dkt. #1) (emphasis in original).  In *People v. Walker*, the New York Court of Appeals specifically declined to adopt the view that "a special preliminary inquest into the underlying facts" of the use of aliases is required whenever the prosecution seeks to use such evidence for impeachment purposes, and declined "to fashion a special rule for alias evidence premised on the assumption that such evidence is inherently suspect[.]" 83 N.Y.2d at 461.   The *Walker* court stated that, in contrast to prior crimes evidence, which is litigated during a *Sandoval* hearing, "there is nothing inherent in alias evidence that suggests a need for extraordinary caution[,]" and therefore "no specialized treatment is required beyond the ordinary principles of common sense and fairness that typically inform trial court discretion[.]" *Id.* at 463 (citing *People v. Ventimiglia*, 52 N.Y.2d 350 (N.Y. 1981) and *People v. Sandoval*, 34 N.Y.2d 371 (N.Y. 1974), which "establish[ed] procedures for advance ruling on admissibility of evidence carrying particular potential for prejudice").

Furthermore, Brazeau has not established that there was any error of federal constitutional law as a result of the failure to litigate the admissibility of his use of aliases at the *Sandoval* hearing. Evidence of a defendant's use of aliases is proper impeachment material as a matter of federal evidentiary law. *See, e.g.*, *Lyda v. United States*, 321 F.2d 788, 793 (9th Cir. 1963) ("[T]he use of false names bears directly enough upon the witness' veracity as to out-weigh the general prohibition against cross-examining about particular acts of misconduct other than convictions of a crime. . . . If a man lie about his own name, might he not tell other lies?"); *accord United States v. Ojeda*, 23 F.3d 1473, 1477 (8th Cir.1994).

With respect to the issue of when the trial court must rule on the admissibility of evidence to be used to impeach a testifying defendant, the Constitution does not mandate a pre-

trial hearing. *See, e.g.*, *United States v. Crisona*, 416 F.2d 107, 117 (2d Cir. 1969).  In the context

of prior crimes evidence, the Second Circuit has held that although the trial court "has discretion

to exclude evidence of prior crimes in an appropriate case and to decide to do so in advance of

defendant's testifying," it is not "necessarily error for the judge to defer exercising that discretion

until the defendant has in fact testified." *Id.* (holding that there was no abuse of discretion in the

trial judge's failure to make an anticipatory ruling) (citing *United States v. Evanchik*, 413 F.2d

950 (2d Cir. 1969) (approving the district court's discretionary refusal to make advisory rulings

in similar circumstances); *United States v. Hart*, 407 F.2d 1087, 1088-1089 (2d Cir. 1969)

(same)).

Notably, *Crisona* came to the Second Circuit on direct appellate review of a federal

criminal conviction, not on collateral review of a state court conviction. The review standard

applicable to Brazeau's federal habeas petition collaterally attacking his conviction based on a

trial court's evidentiary ruling is necessarily more stringent than the standard set forth in *Crisona*.

*See United States v. Frady*, 456 U.S. at 156 ("We reaffirm the well-settled principle that to obtain

collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct

appeal.").  Furthermore, *Crisona* concerned the admissibility of a defendant's prior crimes,

evidence which is indisputably *more* prejudicial than testimony that he simply used aliases in the

past, and therefore arguably could have more of an impact on a defendant's decision whether or

not to testify. As *Crisona* makes clear, there is no *per se* rule in the Second Circuit that the trial

court issue a ruling on prior crimes evidence before the defendant testifies. Furthermore, *Crisona*

framed its holding in terms of a simple "abuse of discretion" standard, illustrating that the claim

being pressed by Brazeau regarding his use of aliases is not one of federal constitutional

dimension nor one in which a "harmless error" analysis is implicated.  Brazeau cannot obtain

habeas relief in the absence of a violation of the constitution or laws of the United States. *See* 28

U.S.C. 2254(a).

In any event, on the facts presented here, the Court cannot conclude that Brazeau's right

to a fair trial was violated. The evidence was properly admissible as a matter of both state and

federal law, and the trial court limited the cross-examination of Brazeau on this point to two

questions–whether he had ever used a false name and if so, how many times.  Brazeau has failed

to demonstrate that the trial court abused its discretion in allowing the prosecutor to question him

about his use of aliases in the past without having obtained an advance ruling at the *Sandoval*

hearing.  *Brundidge v. City of Buffalo*, 79 F. Supp.2d 219 (W.D.N.Y. 1999) (relying upon *Lyda*,

and *Ojeda* to hold that defendants were entitled to cross-examine plaintiff as to her use of aliases

and false Social Security numbers); *Fletcher v. City of New York*, 54 F. Supp.2d 328, 333

(S.D.N.Y. 1999) ("Defendants may inquire into Plaintiff's use of aliases, "without eliciting the

fact that plaintiff was arrested and/or convicted for prior criminal conduct in connection with the

use of these aliases." Accordingly, with this limitation, all eighteen (18) of Plaintiff's aliases are

admissible under Fed.R.Evid. 608(b).") (quoting *Young v. Calhoun*, 85 CIV. 7584 (SWK), 1995

WL 169020, at *5 (S.D.N.Y. Apr. 10, 1995)); *see also United States v. Arocena*, 778 F.2d 943

(2d Cir. 1985) (testifying defendant admitted on cross-examination, *inter alia*, that he had

intentionally lied in the Grand Jury when he denied having used the alias "Medina[ ]"), cert.

denied, 475 U.S. 1053 (1986); *United States v. Murray*, No. 99-10280, D.C. No.

CR-97-00037-MMC, 2000 WL 1459611, *2 (9th Cir. Sept. 28, 2000) (holding that where

witnesses to conspiracy only knew appellant by his alias, district court acted within its authority

in determining that the evidence of his use of an alias was relevant and admissible and properly

permitted limited scope of cross-examination to exclude any reference to appellant's prior

criminal activity or to his status as a fugitive, and instructed the jury, with the consent of both

parties, that appellant's alias was relevant solely to the issue of his credibility), *cert. denied*, 532

U.S. 1024 (2000); *United States v. Kesop*, Nos. 98-1209, 98-2228, 2000 WL 92266, *3 (6th Cir.

Jan. 18, 2000).

For all of the foregoing reasons, the Court recommends denying habeas relief on grounds

eleven and twelve of Brazeau's petition. The Court accordingly recommends that both claims be

dismissed.

**Ground Fourteen[4]:** **The trial court erroneously denied petitioner's "requests for alternative measures to prevent the People from conducting a show up identification" of petitioner at trial.**

Brazeau, for his fourteenth ground for habeas relief, argues that the trial court deprived

him of a fair trial "[b]y denying [his] requests for alternative measures to prevent the People from

conducting a show up identification of [him]self in court seven months after [his] arrest[.]" Pet.

at 24 (Dkt. #1). Brazeau alleges that the police improperly failed to conduct a line-up

identification procedure prior to trial and faults the trial court for denying his requests for "a

variety of procedures, from hearings . . . to simple, inexpensive, alternative options such as

permitting [him] sit elsewhere in the courtroom or having another person of similar appearance

join [him] at counsel's table in an effort to prove the inaccuracy of Barrus' identification of

[him]." Pet. at 25 (Dkt. #25). Essentially, Brazeau is contending that the victim's in-court

---

[4]      There is no Ground Thirteen in Brazeau's petition. *See* Dkt. #1.

identification of him amounted to an impermissibly suggestive "show-up" procedure due to

Brazeau's distinctive appearance; he is "over six feet tall and weigh[s] over two hundred

pounds[,]" and has a shaved head. *See* Pet. at 25 (Dkt. #1).

"A defendant has no constitutional right to a lineup, and the decision whether to grant one

is a matter for the exercise of discretion by the trial court." *Sims v. Sullivan*, 867 F.2d 142, 145

(2d Cir. 1989) (citing, *inter alia*, *United States v. Brown*, 699 F.2d 585, 593 (2d Cir. 1983)). In

*Sims*, the Second Circuit stated that "the failure to grant a lineup may amount to denial of

fundamental fairness where the in-court identification is so unreliable that " 'a very substantial

likelihood of irreparable misidentification' " exists. *Id.* (quoting *Manson v. Brathwaite*, 432 U.S.

at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968) (other citations omitted).

However, " '[s]hort of that point,' " a witness' in-court identification testimony " 'is for the jury to

weigh.' " *Id.* (quoting *Manson*, 432 U.S. at 116). In determining whether that critical point has

been reached, the Second Circuit has directed reviewing courts to be cognizant of their

"obligation to ensure that the in-court procedure . . . did not simply 'amount[ ] to a "show-up." ' "

*United States v. Archibald*, 734 F.2d 938, 941 (2d Cir. 1983), *modified*, 756 F.2d 223 (2d Cir.

1984) (quoting *United States v. Kaylor*, 491 F.2d 1127, 1131 (2d Cir. 1973), *vacated on other*

*grounds sub nom. United States v. Hopkins*, 418 U.S. 909  (1974)).

Brazeau complains that the victim "had never made an identification of [Brazeau] to the

police" prior to trial, and appears to be arguing that should have precluded the victim from

identifying petitioner in court. *See* Pet. at 24 (Dkt. #1). Importantly, however, the Second Circuit

has held that "an in-court identification without a prior line-up or hearing [does not] necessarily

violate a defendant's rights." *Brown*, 699 F.2d at 594. Brazeau contends that because of his

distinctive appearance, having the victim identify him in-court amounted to an impermissibly

suggestive show-up identification procedure. *See* Pet. at 24-25 (Dkt. #1). Brazeau relies largely

on the Second Circuit's decision in *United States v. Archibald*, 734 F.2d 938, *supra*, to support

his claim of entitlement to alternative identification measures at trial. *See* Pet. at 25 (Dkt. #1).

In *Archibald*, the defendant was concerned about the potential suggestiveness of the

traditional in-court identification by a witness. Prior to trial, he had requested either a line-up

procedure or that the district court allow him to sit away from the defense table in the spectator

seating-area, and have five or six other black men seated with him "who looked reasonably like

him, to ensure that he would not be obviously singled out by an educated witness." 734 F.2d at

941. The district court denied both requests, and defendant, who was black, was identified by all

three eyewitnesses. On direct review of defendant's conviction, the Second Circuit agreed that

"the in-court identifications were tainted by unduly suggestive circumstances, namely, that

throughout the trial he was the only black person in the courtroom, except for one day when a

black United States Marshal was present, and that he was seated at the defense table." 734 F.2d

at 940. Although there was no obligation for the district court have to staged a lineup, the Second

Circuit found that there was, however, an obligation to ensure that the in-court procedure here

did not simply amount to a "show-up." *Id.* (citations omitted). Even though it found that the

traditional seating arrangement was suggestive, the Second Circuit nevertheless concluded that

the error was harmless because the pre-trial identifications of the defendant from a photographic

array were sufficient to support the conviction, without the in-court identification. *Id.* ("When the

array with the photo of Archibald is compared to the surveillance photos, it is clear that the

photographic identification testimony alone could have supported the conviction.") (citation

omitted).

The Court has doubts whether *Archibald*, which involved the direct appeal of a federal criminal defendant's conviction, should be considered to have established minimal constitutional standards applicable on federal habeas review of a state court criminal conviction when a defendant requests "special procedures" with respect to an in-court identification. *See*, *e.g.*, *Jarrett v. Headley*, 802 F.2d 34 (2d Cir. 1986). The Second Circuit, reviewing petitioner Jarrett's conviction on federal habeas review, cited *Archibald* for the proposition that "the presence of a defendant at the counsel table during a proceeding at which a witness is expected to identify the defendant may, in certain circumstances, be tantamount to a showup," but stated that "the court *has discretion* to take steps to avoid any unfairness in the identification" 802 F.3d at 45 (citing *United States v. Archibald*, 734 F.2d at 941-43) (emphasis supplied)).  In *Jarret v. Headley*, the Second Circuit found , there was no impropriety attributable to the prosecution in the present case because, as the district court found, petitioner did not request either not to be present or to be seated somewhere other than at counsel table. *Id.* (citing *Boyd v. Henderson*, 555 F.2d 56, 61-62 (2d Cir.), *cert. denied*, 434 U.S. 927 (1977); *United States v. Brown*, 699 F.2d at 594 (where defendant has prior notice of an in-court identification, no constitutional rights are violated if defense did not request either pre-trial line-up or that defendant be allowed to sit in audience with others of similar appearance). Furthermore, as the district court observed in *Bond v. Walker*, 68 F. Supp.2d 287, 301 (S.D.N.Y. 1999), *Archibald* has not been cited in cases involving habeas corpus review of an in-court identification by a witness who had not made a pre-trial identification, making it doubtful that the Second Circuit's decision in *Archibald* established a constitutional standard applicable on federal habeas review of a state court

conviction. *See Bond*, 68 F. Supp.2d at 301. The district court surmised in *Bond* that *Archibald* likely was based on the Second Circuit's supervisory authority over federal criminal proceedings rather than on any minimum due process requirement. *See id.*

The final, and most important reason, why *Archibald* does not provide a basis for habeas relief in Brazeau's case is that, in the wake of AEDPA, a federal habeas court may not grant a writ of habeas corpus based solely on an erroneous application of *circuit* precedent. Rather, it must find that there was an unreasonable application of clearly established federal law, as set forth in the Supreme Court's majority holdings. *See Williams v. Taylor*, 529 U.S. at 412. Thus, even if Brazeau could show that he was entitled to relief under *Archibald*, which he has not done, the writ would not necessarily obtain. As the district court noted in *Bond v. Walker*, the fifteen year old Archibald decision may no longer be good law, in light of subsequent Supreme Court and Second Circuit developments in the law applicable to pretrial and in-court identifications. *Bond v. Walker*, 68 F. Supp.2d at 321; *see also id.* at n.7 (noting that one commentator has called *Archibald* "the high-water mark of protection afforded to suggestive in-court identifications") (quoting Evan J. Mandery, *Legal Development: Due Process Considerations of In-Court Identifications*, 60 ALB. L. REV. 389, 402 (1996)).

Even if *Archibald* were applicable on federal habeas review of Brazeau's state court conviction, the Court recommends finding that there was no abuse of discretion by the trial court. As an initial matter, because Brazeau failed to request a line-up prior to trial, he is not entitled to relief under *Archibald*. On rehearing in the *Archibald* case, the Second Circuit clarified that "special procedures," such as those requested by Brazeau here, "are necessary only where (1) identification is a contested issue; (2) the defendant has moved in a timely manner prior to trial

for a lineup; and (3) despite that request, the witness has not had an opportunity to view a fair out-of-court lineup prior to his trial testimony. . . ." *United States v. Archibald*, 756 F.2d 223, 223 (2d Cir. 1984) (*Archibald II*); accord *Jarrett v. Headley*, 802 F.2d at 45 (denying habeas petition; holding that there was no impropriety attributable to prosecution rendering pre-trial identification impermissibly suggestive based on fact that defendant was present at counsel table during hearing held pursuant to *Wade* because defendant failed to request either not to be present or to be seated somewhere other than at counsel table). At Brazeau's sentencing hearing on March 14, 2001, when this issue was argued, the prosecutor noted that "Mr. Brazeau not only didn't request some type of [pre-trial identification] proceeding but opposed any type of proceeding short of going to trial." S.28. Because Brazeau failed to make his request for a line-up procedure in a timely manner prior to the commencement of trial, the state court was not obligated under *Archibald* to craft "special procedures" with regard to the victim's in-court identification. *Archibald*, 734 F.2d at 941-43; *Archibald II*, 756 F.2d at 223; *accord Bond v. Walker*, 68 F. Supp.2d at 300; *Jarrett v. Headley*, 802 F.2d at 45.

As the Second Circuit emphasized in *United States v. Matthews*, "[e]ven an identification at trial under circumstances that are tantamount to a showup is 'not *per se* inadmissible, but rather depend[s] upon the "totality of the circumstances." ' " *United States v. Matthews*, 20 F.3d at 547 (quoting *United States v. Archibald*, 734 F.2d at 942); *see also*, *e.g.*, *United States v. Kaylor*, 491 F.2d at 1131. The "totality of the circumstances" include . . . Thus, regardless of whether it is a suggestive pre-trial or an at-trial identification, "reliability is the linchpin for determining admissibility." *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. at 116). Assuming for the sake of argument that Brazeau had triggered *Archibald* based on his request for "special

procedures," the trial court's failure to grant petitioner's application would not require this Court

to grant habeas relief. Rather, the Court would be required to weigh the corrupting effect of the

in-court identification procedures with the identification reliability factors set out by the court in

*Neil v. Biggers*, 409 U.S. at 199-200, and *Manson v. Brathwaite*, 432 U.S. at 114. *Accord Bond

v. Walker*, 68 F. Supp.2d at 302 (citing *United States v. Matthews*, 20 F.3d at 547; *United States

v. Estremera*, 531 F.2d at 1111-12 (stating that whether trial court abused discretion in denying

lineup before trial identification "requires [the court] us to consider all relevant circumstances")

(cited in *Archibald I*, 740 F.2d at 941); *Chapman v. Meachum*, 790 F. Supp. 63, 66-67 & n. 4 (D.

Conn.) (applying *Neil v. Biggers* factors to initial in-court identification), *aff'd mem.*, 979 F.2d

846 (2d Cir. 1992)).

      Courts in other circuits have explicitly held that the admissibility of an initial in-court

identification–that is, one that does not follow an earlier pre-trial identification by the witness–is

based on the totality of the circumstances, including the five *Neil v. Biggers* reliability factors.

*Bond v. Walker*, 68 F. Supp.2d at 303 (citing *United States v. Rogers*, 126 F.3d 655, 658 (5th Cir.

1997); *United States v. Murray*, 65 F.3d 1161, 1168-69 & n. 6 (4th Cir. 1995) ("Based on the

totality of the circumstances, we agree that although the Government allowed the witnesses to

see [defendant] seated at the defense table prior to their testimony, it did not create a substantial

likelihood of irreparable misidentification. . . . [Defendant] presents no evidence of a likelihood

of misidentification other than the fact that both witnesses saw him seated at the defense table

prior to testifying."); *United States v. Hill*, 967 F.2d 226, 230-32 (6th Cir.) ("We hold that the

*Biggers* analysis applies to such [initial] in-court identifications for the same reasons that the

analysis applies to impermissibly suggestive pretrial identifications."), *cert. denied*, 506 U.S. 964

(1992); *United States v. Rundell*, 858 F.2d 425 (8th Cir. 1988) (applying *Neil v. Biggers* factors to

initial in-court identifications); *Code v. Montgomery*, 725 F.2d 1316, 1319-20 (11th Cir. 1984)

(applying *Neil v. Biggers* factors to in-court identification where there was no pretrial

identification; while it "is unfortunate that no pretrial identification procedures were undertaken,

. . . failure to hold a pretrial lineup does not violate due process.")).

     Reviewing the totality of the circumstances under the *Neil v. Biggers* reliability factors,

the state trial court's admission of the victim's in-court identification of Brazeau at trial, made in

the traditional manner without any of petitioner's requested "special procedures," did not

constitute constitutional error. First, the victim explained that, prior to the crime, he had watched

petitioner playing pool at the bar and petitioner had repeatedly come up to his table to make

insulting comments to him. The victim thus had ample opportunity to view petitioner under well-

lit conditions prior to the crime. The victim left the bar and turned around to hear petitioner

standing in the lit doorway of the bar and calling to him. Then, moments later, as the victim was

walking through a parking lot, petitioner suddenly appeared and started walking very close to

him. Petitioner engaged him in a brief conversation, asking him if he wanted to go to his house

on 25th Street and have a beer. T.334-36. There was a tall lightpost with a flood light in the

parking lot. T.331.

     With regard to the second factor, the witness' degree of attention, victims of crimes tend

to closely observe their assailants out of fear for their safety. *See Bond v. Walker*, 68 F. Supp.2d

at 306) (citing *Yearwood v. Keane,* No. 95-2404, 1996 WL 282134, at *1 (2d Cir. May 29, 1996)

(unpublished opn.) ("As a robbery victim, [witness] had an interest in the event and reason to pay

attention to his attacker."); *United States v. Wong*, 40 F.3d at 1360 (finding witness' degree of

attention to be "very high" while she feared for her own and her husband's safety); *United States v. Concepcion*, 983 F.2d 369, 378 (2d Cir.1992) (finding that the "nature of events" in victim's struggle with the defendant and the shooting "was such as to attract and hold [the witnesses'] attention"), *cert. denied*, 510 U.S. 856 (1993); *Gonzalez v. Hammock*, 639 F.2d 844, 847 (2d Cir. 1980) ("Although [the witness] was not a trained observer of people, such as a police officer, there is little doubt that his attention would be riveted on a man who was pulling a shotgun from a bag."), *cert. denied*, 449 U.S. 1088 (1981)). The victim testified that he had been harassed all evening by Brazeau and then was followed by him–the history of their interaction was such that the victim reasonably would have been suspicious that this man, who had been antagonizing him earlier, now was acting in a friendly manner and inviting to come to his house for a beer. Thus, Barrus had reason to be paying attention to Brazeau during this encounter in the parking lot.

Third, the accuracy of the witness' prior description of the criminal is a factor that is neutral. The victim consistently identified his assailant as a large, bald white male who had been playing pool for Wagner's Bar. However, the trial court instructed the jury that it was not permitted to consider evidence of the description of his attacker that the victim had given to the police at the time he reported the incident because "such description [might] match a great many other persons as well as possibly matching defendant[.]" T.511.

Fourth, the victim's trial testimony showed no hesitation and a high degree of certainty as to his identification of Brazeau. As noted above, despite Brazeau's attempts to alter his appearance at trial by growing his hair and his goatee, Barrus did not waver in his testimony that Brazeau was the big, bald individual who accosted him in the Wilson Farms parking lot, punched him in the face, and robbed him. *See, e.g.*, T.355, 369, 385.

Fifth, the length of time between the incident and the in-court identification was about

seven months (the incident occurred in March 2000 and Brazeau's trial was held in October of

that year). Although this potentially favors Brazeau, federal courts have found that longer

intervals of time, although weighing against reliability, do not necessarily render the in-court

identification unreliable. *E.g.*, *United States v. Wong*, 40 F.3d at 1360 (ten months between crime

and identification, "while a factor militating against reliability, may be outweighed"); *United*

*States v. Maldonado-Rivera*, 922 F.2d 934, 976 (2d Cir.1990) ("And though [the defendant]

argues that the interval of nearly a year between [the witness'] last meeting with [the defendant]

and her identification of his photograph makes that identification suspect, the length of that

interval is outweighed by" other factors that indicated her identification was reliable.), *cert.*

*denied*, 501 U.S. 1211(1991). *See also Neil v. Biggers*, 409 U.S. at 201 (holding that even though

station house showup may have been suggestive, and notwithstanding lapse of seven months

between crime and the confrontation, there was no substantial likelihood of misidentification and

evidence concerning the out-of-court identification by victim was admissible, where victim spent

up to half an hour with her assailant, victim was with assailant under adequate artificial light in

her house and under a full moon outdoors and at least twice faced him directly and intimately,

victim's description to police included her assailant's approximate age, height, weight,

complexion, skin texture, build, and voice, victim had 'no doubt' that defendant was person who

raped her, and victim made no previous identification at any of the showups, lineups, or

photographic showings); *United States v. Rundell*, 858 F.2d 425, 427 (8th Cir. 1988) (stating that

an eight month delay was a negative factor but "this factor alone does not render the [initial]

in-court identifications so unreliable as to be inadmissible. . . . Rather, the passage of time was a

proper item for cross-examination and closing argument, . . . and a circumstance for the jury to

consider in assessing the weight to be given the identification testimony.") (citing *United States*

*v. Robinson*, 782 F.2d 128, 131-32 (8th Cir. 1986) (identification admissible despite five-month

lapse between crime and in-court confrontation); *United States v. Samalot Perez*, 767 F.2d 1, 3

(1st Cir.  985) (identification admissible despite four-year delay)).

Considering all the *Neil v. Biggers* factors, the Court finds that the factors weighing favor

of reliability strongly outweigh any potential unreliability caused by the seven-month delay

between the incident and the victim's trial identification of Brazeau. The victim's in-court

identification of Brazeau was reliable and properly admitted; the weight to be given to it,

therefore, was for the jury to decide. *See*, *e.g.*, *Dunnigan v. Keane*, 137 F.3d  at 128 ("'Short of

th[e] point' at which the court must conclude, after considering the[ ] [*Neil v. Biggers*] factors,

that 'under all the circumstances of th[e] case, there is a very substantial likelihood of irreparable

misidentification,' the presence of some element of untrustworthiness goes only to the

identification's weight, not to its admissibility."); *accord*, *Bond v. Walker*, 68 F. Supp.2d at 306-

07 (after considering reliability in light of the five *Neil v. Biggers* factors, finding the victim's

trial identification of petitioner to be reliable "despite the inherent suggestiveness of the

traditional in-court identification"; holding that the weight to be given her identification was

issue for jury).

As a final matter, the Court notes that in certain cases, "[t]here may . . . be sound tactical

reasons for defense counsel not to make . . . a request [for special procedures as discussed in

*Archibald*], given "the apparent weakness of this kind of [in-court] identification." *United States*

*v. Matthews,* 20 F.3d 538, 547 (2d Cir. 1994) (quoting *Brathwaite v. Manson*, 527 F.2d 363, 367

n. 6 (2d Cir. 1975), *rev'd on other grounds*, 432 U.S. 98 (1977)). Where, as here, the witness has

had "a sufficient opportunity to view the person who was engaged in the commission of the

crime," the defense "may well deem it preferable not to chance bolstering the in-court

identification . . . in any way," which allows argument to the jury that the in-court identification

was inherently weak." *Id.* (citing *Manson v. Brathwaite*, 432 U.S. at 116 ("Juries are not so

susceptible that they cannot measure intelligently the weight of identification testimony that has

some questionable feature.")). In this case, Brazeau "request[ed] to be the only person seated at

the defense table[,]" and "[t]hat request was honored."  *Id.* Brazeau was "dressed in business

attire provided by the District Attorney's Office," namely "a shirt, tie, pants, shoes, [and] socks,

appropriate attire." S.28. As the prosecutor pointed out to the trial court, "[f]or all Mr. Barrus

[the victim] knew, when he came in this courtroom [Brazeau] was Mr. Arbour [stand-by counsel]

and the defendant had absented himself, because he wasn't pointed out as being either an

attorney[,] a defendant or anyone else." S.28.  Apart from the fact that Brazeau was seated at the

defense table, there were no other indicators that he was a defendant in custody. Furthermore,

Brazeau argued strenuously to the jury that the victim's identification of him was suspect and

urged the jury to question the fact that the police did not conduct an identification procedure at

the time of the incident. *See* T.771-72.

  For all of the foregoing reasons, the Court finds that Brazeau was not denied his rights to

due process and a fair trial by the trial court's failure to conduct a line-up during trial or to

employ "special procedures" in connection with the victim's in-court identification of him.

Brazeau's fourteenth claim in his petition should not provide a basis for habeas relief. *Accord*,

*e.g.*, *Alvarez v. Conway*, No. 05 CIV. 3235 (NRB), 2005 WL 3434634, at *8 (S.D.N.Y. Dec. 13,

2005) (denying habeas petitioner's claim that two witnesses should have been required to identify him in an in-court lineup pursuant to *Archibald*, 734 F.2d at 942, since they had not previously done so; there no constitutional right to a lineup, however, and the decision to grant one is left to the discretion of the trial court) (citing *Sims v. Sullivan*, 867 F.2d at 145; *Bond v. Walker*, 68 F. Supp.2d at 298-301)). Accordingly, the Court recommends that it be dismissed.

## IV.     Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner Michael C. Brazeau be **DENIED**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: July 12, 2007
        Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: Buffalo, New York
      July <u>12</u> , 2007.